# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-30324

United States Court of Appeals
Fifth Circuit

**FILED**

January 19, 2016

Lyle W. Cayce
Clerk

SEAHAWK LIQUIDATING TRUST,
  as Trustee of Seahawk Drilling, Incorporated,

Plaintiff–Appellant,

versus

CERTAIN UNDERWRITERS AT LLOYDS LONDON;
ACE EUROPEAN GROUP LIMITED;
NATIONAL UNION FIRE INSURANCE COMPANY
  OF PITTSBURGH, PENNSYLVANIA;
AXIS SPECIALTY EUROPE, LIMITED;
LANCASHIRE INSURANCE COMPANY, LIMITED;
SWISS RE INTERNATIONAL SE;
ASPEN INSURANCE U.K. LIMITED; BERKLEY INSURANCE COMPANY;
ARCH INSURANCE COMPANY;
INTERNATIONAL INSURANCE COMPANY OF HANNOVER, LIMITED;
HUDSON SPECIALTY INSURANCE COMPANY;
NAVIGATORS INSURANCE COMPANY;
NEW YORK MARINE & GENERAL INSURANCE COMPANY;
TORUS INSURANCE,

Defendants–Appellees.

Appeal from the United States District Court
for the Middle District of Louisiana

No. 15-30324

Before SMITH, WIENER, and GRAVES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This appeal follows a bench trial and judgment for the defendant insurers on the claims of Seahawk Liquidating Trust ("Seahawk") for payment of insurance proceeds. There is no error, so we affirm.

I.

Seahawk[1] operated a fleet of drilling rigs, one of which was the J/U SEAHAWK 3000 (the "Rig"), a three-legged, mat-supported jack-up drilling rig with 375-foot legs used to perform drilling contracts in the Gulf of Mexico beginning in 1974.[2] In February 2010, while moving between drilling locations, the Rig encountered severe weather and jacked up out of the water for several days to avoid the harsh seas. Despite those efforts, the rough seas still caused the legs to become misaligned.

Between February and April, Seahawk repaired the hydraulic-jacking system on several occasions, actions that were consistent with the Rig's history: It had had consistent wear-and-tear problems with, and required repairs to, its hydraulic-jacking system for more than twenty years. In April, the Rig traveled to perform a drilling contract for Hilcorp Drilling Company ("Hilcorp"), but Seahawk still did not know that the legs were misaligned. The Rig

---

[1] Seahawk Drilling, Inc. filed for bankruptcy, and its trustee pursued these claims against Lloyds. We refer to both as "Seahawk."

[2] A jack-up drilling rig drills for oil offshore at exploratory and developmental wells. These rigs must be towed between drilling locations. Mat-supported jack-up rigs have a hull that usually floats on the surface and connects to three or four legs that attach to a mat that must be extended to the sea floor to raise the hull out of the water in order for the rig to drill. A hydraulic-jacking system extends the legs and mat down and elevates the hull using a mechanism by which pins that are attached to the hull enter the legs, push the legs down, come out of the legs, re-enter, and push down again. The hydraulic-jacking system repeats this process until the hull reaches the necessary height.

No. 15-30324

failed to jack up to a sufficient height to perform the Hilcorp contract because of other problems with the hydraulic-jacking system, leading Hilcorp to request that Seahawk provide a replacement rig, which it did at a cost of $1,092,000.

Though Seahawk brought in a replacement, the Rig became stuck for several days at the Hilcorp location after an incident during the jacking-down process caused further damage to the hydraulic-jacking system. That incident required temporary repairs to the jacking system while the Rig was stuck and further such repairs once it successfully jacked down and moved to a dry dock. At some point in May, while the Rig was in dry dock, Seahawk learned the legs were misaligned but did not fix them because doing so would be too expensive.

After that dry-dock period, the Rig departed in early July to perform another drilling contract, which it completed in calm weather, though the crew used an unorthodox method to jack it up—the Rig essentially jacked up one side of the hull at a time, rather than jacking up the entire hull uniformly. Seahawk's expert, Crane Zumwalt, testified that the crew developed that procedure to compensate for the misaligned legs and that the Rig always succeeded in jacking up if—as with this drilling contract—the weather and seas were calm.

On July 21, 2010, the weather and seas were not calm as the Rig arrived to perform a drilling contract at East Cameron Island. In those conditions, the Rig's operating manual forbade its crew from jacking it into or out of the water, but the crew attempted to jack it out of the water nonetheless. The hydraulic-jacking system became disengaged when the Rig attempted to jack up, causing the hull to slide down the legs and float in the sea. The crew, before evacuating, attempted to jack the Rig back up to no avail, and the Rig floated in the rough seas, sustaining further damage, for nearly thirty hours. Zumwalt testified that the Rig would have been able to jack up—and jack back up after sliding

3

No. 15-30324

down—without incident if the weather had been calm.

After the July 21 storm, the Rig went to dry dock for further repairs until December 2010. The repairs again focused on the hydraulic-jacking system instead of the misaligned legs; Seahawk never repaired the legs. While the Rig was in dry dock, Seahawk submitted a claim to the insurers to cover the cost of repairs, alleged to be $16,969,860. The insurers rejected the claim.

## II.

Seahawk sued the insurers for proceeds covering the physical damage to the Rig and the loss on the Hilcorp contract. Seahawk's insurance policy (the "Policy")[3] included several key provisions:

- The general-coverage provision: "This insurance is against all risks of direct physical loss of or physical damage to the property insured, subject to the terms, conditions, and exclusions contained herein . . . . This Insurance covers all the hull and machinery of the drilling unit(s) . . . ."

- The $10,000,000-deductible provision: "For the purpose of this [Deductible] Clause, each occurrence shall be treated separately, but it is agreed that a sequence of losses or damages arising from the same occurrence shall be treated as one occurrence."

- The wear-and-tear exclusion: "There shall be no recovery under this Insurance in respect of . . . [the] Cost of repairing or replacing any part which may be lost, damaged or condemned solely due to . . . wear and tear . . . ."

- The loss-of-contract provision (the "Contract Provision"): "[C]overage hereunder shall include the loss of charter hire resulting from the termination and/or cancellation of [Seahawk's] drilling contract(s) caused by the insured drilling units being unable to operate following a claim recoverable under [the general-coverage provision] if the deductible were nil."

---

[3] Each incident took place during one of two separate policy periods; one ended and the other began on June 30, 2010. The content of the policies is identical; Swiss Re International SE was an underwriter of the first policy only, and Hudson Specialty Insurance Company, Navigators Insurance Company, New York Marine & General Insurance Company, and Torus Insurance were underwriters on the second policy only.

No. 15-30324

Seahawk sought to recover the nearly $17 million for repairs made between February and December 2010. After a three-day bench trial, the district court determined that the insurers had properly rejected the claim because they found that there were two occurrences, meaning two $10 million deductibles had to be met, so Seahawk could recover nothing.[4] There were two occurrences, the court reasoned, because the sequence of losses (i.e., the damages and subsequent repairs) between February and July was proximately caused by the February storm, but the sequence of losses after the July storm was proximately caused by that latter storm. There were two separate proximate causes of two different series of losses, so there were two occurrences.

Seahawk also sought to recover under the Contract Provision. It maintained that the misalignment of the legs caused the Rig to be unable to operate and thereby occasioned the loss of the Hilcorp contract; the misalignment was caused by a severe weather event and would have been recoverable if the deductible were nil; thus, the loss on the Hilcorp contract was recoverable.

The district court found, to the contrary, that the misaligned legs (a theoretically covered loss) at most contributed to the defective hydraulic-jacking system (an excluded loss, as it was caused by wear-and-tear) in causing the loss of the contract. That finding required that the court apply the concurrent-cause doctrine.

III.

The Policy provides that it is governed by Texas law, under which the interpretation of an insurance policy is a question of law, which we review *de novo. Ran-Nan Inc. v. Gen. Accident Ins. Co. of Am.*, 252 F.3d 738, 739 (5th

---

[4] The parties stipulated after trial that Seahawk could not recover if there was more than one occurrence.

5

No. 15-30324

Cir. 2001). The parties agree that Texas substantive law applies. We review any underlying factual findings for clear error. *Theriot v. United States*, 245 F.3d 388, 394–95 (5th Cir. 1998). A factual finding, such as a causation determination, is clearly erroneous only "when the appellate court, viewing the evidence in its entirety, is left with the definite and firm conviction that a mistake has been made." *Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373, 376 (5th Cir. 2012). "Re-stated, our court may not find clear error if the district court's finding is plausible in light of the record as a whole, even if this court would have weighed the evidence differently." *Id.* at 376–77 (alterations omitted).

## IV.

Because there were two occurrences, the district court properly denied Seahawk's claim for the cost of repairs between February and December 2010. That court's proximate-cause analysis was the correct legal standard for determining the number of occurrences, and the court did not clearly err in finding that the February storm was not the proximate cause of the sequence of losses following the July storm.

## A.

Under Texas law, we must construe the Policy according to the general rules of contract construction to give effect to the intent. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010).[5] We begin with the policy language, giving the terms their "ordinary and generally-accepted meaning unless the policy shows the words are meant in a technical or different sense." *Id.* When an issue of state law is unclear, a federal court

---

[5] Our decisions often refer to Certain Underwriters at Lloyd's as "Lloyd's." In their briefs, however, these parties use "Lloyds."

must make an "*Erie* guess" as to what the state's highest court would decide.[6]

Seahawk's first claim turns entirely on the meaning of "occurrence," which, according to its ordinary and generally-accepted meaning, is "something that occurs"[7] or "something that takes place; *esp*: something that happens unexpectedly and without design."[8] The parties appear not to contest that the February storm was an occurrence; under that ordinary meaning, the July storm would appear to be an occurrence too.

Seahawk, however, contends that the Policy gives "occurrence" a technical meaning by defining it to include "a sequence of losses or damages arising from the same occurrence." The February storm, according to Seahawk, was an occurrence that damaged the Rig's legs and was a but-for cause of the damages suffered after the July storm because the damaged legs slowed down the jacking-up process. Because the Rig's damaged legs contributed to the damages after the July storm, Seahawk characterizes all of the losses between February and December as "arising from the same [February] occurrence."

The insurers maintain, to the contrary, that any damages after the July storm arose from that storm, not the February storm. Like the district court, the insurers interpret the phrase "arising from" to require that the occurrence be the proximate cause of the "sequence of losses or damages." Thus, even if the February storm damaged the legs and thereby contributed to the losses after July, the July storm would be the proximate cause of—and the occurrence giving rise to—the sequence of losses thereafter.

The real issue, then, is how to interpret the term "arising from" when

---

[6] *Farm Credit Bank v. Guidry*, 110 F.3d 1147, 1149 (5th Cir. 1997), *overruled on other grounds by Canfield v. Orso (In re Orso)*, 283 F.3d 686 (5th Cir. 2002).

[7] *"Occurrence,"* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1984).

[8] *"Occurrence,"* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986).

used to determine the number of occurrences under the Policy. Seahawk claims the term requires only a causal link between the occurrence and subsequent losses because Texas law construes "arising from" broadly in favor of coverage. The Texas Supreme Court has stated that "arise out of" requires "simply a causal connection or relation, which is interpreted to mean that there is but for causation, though not necessarily direct or proximate causation."[9] But the court broadly interpreted "arising from"—or relied on cases broadly interpreting that term—only in different contexts in which a broad interpretation would *increase* coverage.[10] The court seems not to have addressed the term when used to determine the number of occurrences, so we must make an *Erie* guess as to how the court would interpret "arising from" in this context.

For two reasons, that court likely would adopt the proximate-cause analysis applied by the district court. First, as the insurers point out, interpreting "arising from" broadly to require only a causal link when determining the number of occurrences can expand coverage in one case while contracting it in another. For example, Seahawk desires a recognition of only one occurrence to avoid the application of multiple deductibles—a broad construction would increase coverage. But in another case with identical facts but a slightly different insurance policy, an insured may desire multiple occurrences to avoid

---

[9] *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004). We interpret identically the terms "arising out of" and "arising from." *Am. States. Ins. Co. v. Bailey*, 133 F.3d 363, 370 n.7 (5th Cir. 1998).

[10] *See, e.g.*, *Utica Nat'l Ins.*, 141 S.W.3d at 203 (interpreting "arising out of" broadly to reduce the scope of a policy's exclusionary provision); *Mid-Century Ins. Co. of Tex. v. Lindsey*, 997 S.W.2d 153, 156–59 (Tex. 1999) (broadly interpreting the term "arise out of" with regard to the use of a motor vehicle to cover the accidental discharge of a weapon after an attempt to enter the vehicle); *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 312–13 (5th Cir. 2010) (interpreting "arise out of" broadly to find that a conditional exclusion did not apply); *Red Ball Motor Freight, Inc. v. Emp'rs Mut. Liab. Ins. Co. of Wis.*, 189 F.2d 374, 378 (5th Cir. 1951) (interpreting "arising out of" the use of a truck broadly to provide coverage for damages from the driver's negligent refueling).

the application of a single policy limit—a narrow construction would increase coverage. Although Texas favors broadly construing policies to provide for coverage, there is no reason to predict—given the conflicting effects on coverage—that the Texas Supreme Court would broadly construe "arising from" in this context.

Second, the proximate-cause analysis is at least implicitly consistent with our and Texas's precedent. Three cases in particular illustrate this point.[11] In each, the policy defined an occurrence as losses "arising out of" a single event or continuous exposure to a condition. And, in each, the court ignored a but-for cause and focused on the direct, immediate, and proximate cause of the losses to determine the number of occurrences.

In *Goose Creek*, an arsonist set fire to two schools in the same school district. Although the same arsonist was the but-for cause of both fires, the fires occurred several blocks and at least two hours apart, and neither caused the other. The school district claimed there was one occurrence and thus one deductible. According to the court, though, there were two occurrences because the "two fires [were] distinguishable in space and time [and] one did not cause the other." *Goose Creek*, 658 S.W.2d at 341. Though the fires were traced back to the same but-for cause, there were two occurrences because the damages directly arose from two separate fires.

In *U.E. Texas*, nineteen buildings in an apartment complex suffered damage from plumbing leaks. Hoping to pay one deductible, the owner contended there was only one occurrence because the leaks allegedly arose from

---

[11] *Goose Creek Consol. Indep. Sch. Dist. v. Cont'l Cas. Co.*, 658 S.W.2d 338 (Tex. App.—Houston [1st Dist.] 1983, no writ); *U.E. Tex. One-Barrington, Ltd. v. Gen. Star Indem. Co.*, 332 F.3d 274 (5th Cir. 2003); *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526 (5th Cir. 1998).

one defective installation of plumbing.  The parties stipulated, however, that each leak affected only the specific building under which it occurred.  Although there was ostensibly one "overarching cause"—the installation—the court instead focused on the "specific event[s] that caused the loss," *U.E. Tex.*, 332 F.3d at 278—the individual leaks—to conclude there were nineteen occurrences:

> To point to the installation of the pipes as a single event which gave rise to the damage to the nineteen buildings proves too much.  Of course it is true that had the plumbing system never been installed the leaks would not have occurred.  In this sense, it is true that the leaks which independently damaged the nineteen buildings arose from the same event.  However, to look this far back would render any damage to the complex occurring at any time related to the plumbing as arising from the same event.

*Id.*

In *H.E. Butt*, one employee sexually abused two children in the same bathroom at the same grocery store but on different occasions.  Hoping to limit liability under its self-insurance, the insured claimed there was only one occurrence because both incidents arose from its negligent supervision of the employee.  The court said that "[t]he question under Texas law becomes whether HEB's negligent employment relationship with its pedophilic employee, rather than the two acts of sexual abuse, 'caused' the injuries to the two children and gave rise to HEB's liability." *H.E. Butt*, 150 F.3d at 530.  Although negligent supervision plainly was a but-for cause of the children's injuries, there would be no injury or exposure to liability without the intervening sexual abuse. *Id.* at 531.  There were two occurrences because

> [w]hile a single occurrence may result in multiple injuries to multiple parties over a period of time . . . [,] *if one cause is interrupted and replaced by another intervening cause, the chain of causation is broken and more than one occurrence has taken place.*  Here, it is clear that each child's injuries are independent and caused by the separate acts of sexual abuse.

*Id.* at 534 (alterations in original) (emphasis added) (internal citations

omitted).[12]    The court discounted a but-for cause and explicitly used the proximate-cause analysis to determine the number of occurrences.

The proper conclusion here follows naturally from the three above-cited decisions:  When an occurrence is technically defined to include a series of losses arising from the same event, it includes only those losses *proximately caused* by that event.  The Policy defines an occurrence as a series of losses "arising from" the same occurrence and thereby incorporates the proximate-cause analysis.[13]  Thus, the district court applied the correct legal standard in determining the number of occurrences by analyzing whether the February storm was the *proximate* cause—not just a contributing or but-for cause—of the sequence of losses between February and December 2010.

## B.

The task remains to review the district court's factual finding that the July storm—rather than the February storm—was the proximate cause of the sequence of losses after July.  Again, we review the district court's causation determinations only for clear error and uphold the same if plausible in light of the record as whole.  *Manderson*, 666 F.3d at 376–77.

---

[12] The court relied on *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.*, 676 F.2d 56, 61 (3d Cir. 1982), which held that to determine the number of occurrences "the court asks if there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage."  (Alteration and internal quotation marks omitted.)

[13] Seahawk points to *All Metals, Inc. v. Liberty Mutual Fire Insurance Co.*, No. 3-09-CV-0846-BD, 2010 WL 3027045, at *1 (N.D. Tex. 2010), for the proposition that we none-theless might broadly interpret "arising from."  *All Metals* does not support Seahawk's argument, because the policy there defined "occurrence" to include all damages at least indirectly stemming from the same event.  By explicitly defining "occurrence" to include indirect causes, the parties had rejected the proximate-cause analysis.  *Cf. Fed. Ins. Co. v. Bock*, 382 S.W.2d 305, 307 (Tex. App.—Corpus Christi 1964, writ ref'd n.r.e.) ("A proper definition of *direct* loss is loss proximately caused by the peril insured against." (emphasis added)); *Utica Nat'l*, 141 S.W.3d at 203 (equating direct causation with proximate causation).  Unlike the parties in *All Metals*, Seahawk and the insurers did not expressly reject the proximate-cause analysis, so we apply it.

The court noted that a proximate cause is "that cause which in a natural and continuous sequence unbroken by any new and intervening cause, produces a loss, and without which the loss would not have occurred." *Bock*, 382 S.W.2d at 307. There was significant evidence to support the determination that the July storm, not the February storm, was the proximate cause of the sequence of losses after July. Zumwalt testified that the misaligned legs, caused by the February storm, did not prevent the Rig from jacking up in calm weather—testimony that was further bolstered by the Rig's successful completion of a contract in calm weather in early July despite its misaligned legs. Moreover, Zumwalt testified that the Rig continued to jack up without incident for at least three and one-half years after the events at issue, despite Seahawk's never having repaired the legs. The evidence also showed that the weather was severe on July 21 before the crew attempted to jack up in violation of the operating manual. Finally, the court noted that five months elapsed between the February and July storms, and Seahawk knew of the misaligned legs for at least two months before the July storm yet did not repair them.

We cannot say that, given this evidence, the court clearly erred by finding the February storm alone, "in a natural and continuous sequence unbroken by any new and intervening cause," would not have produced the sequence of losses after the July storm. *See id.* The July storm was thus an intervening and proximate cause of the losses.

## V.

The district court did not err in rejecting Seahawk's claim under the Contract Provision. The concurrent-cause doctrine applies, and Seahawk could not recover because it failed to comply with the requirements of that doctrine.

Under Texas law, the concurrent-cause doctrine applies any time "covered and non-covered perils combine to create a loss" and limits an insured's

recovery to the "portion of the damage caused solely by the covered peril(s)." *Wallis v. United Servs. Auto. Ass'n,* 2 S.W.3d 300, 302–03 (Tex. App.—San Antonio 1999, pet. denied). The doctrine is "a rule which embodies the basic principle that insureds are entitled to recover only that which is covered under their policy . . . ." *Id.* at 303. Therefore, "[i]t is essential that the insured produce evidence which will afford a reasonable basis for estimating . . . the proportionate part of damage caused by a risk covered by the insurance policy." *Travelers Indem. Co. v. McKillip,* 469 S.W.2d 160, 163 (Tex. 1971). "[A]n insured's . . . burden of proof on allocation . . . is central to the claim for coverage." *Wallis,* 2 S.W.3d at 303. "Where a loss, however, is caused by a covered peril and an excluded peril that are *independent* causes of the loss, the insurer is liable." *Guar. Nat'l Ins. Co. v. N. River Ins. Co.,* 909 F.2d 133, 137 (5th Cir. 1990) (emphasis added). Thus, the concurrent-cause doctrine applies to limit recovery only when the loss is caused by two concurrent causes instead of two independent causes.

The district court made a factual finding that the misaligned legs (a covered peril) at most combined with the defective hydraulic-jacking system (an excluded peril)[14] to cause the loss of the Hilcorp contract. We review that factual finding only for clear error, *Manderson,* 666 F.3d at 376–77, and conclude there was sufficient evidence to support it. For example, Hilcorp requested that Seahawk replace the Rig specifically because malfunctions with the hydraulic-jacking system were visible; Hilcorp, apparently, did not notice the misaligned legs. Further, Zumwalt testified that nobody at Seahawk even knew the legs were misaligned at this point and that the Rig had experienced problems with its hydraulic-jacking system continuously for over twenty years.

---

[14] Seahawk does not challenge the finding that the hydraulic-jacking system's problems were caused by wear-and-tear and were thus excluded from coverage.

No. 15-30324

Additionally, the court noted that the Rig continued to complete drilling contracts over the next three and one-half years without Seahawk's ever repairing its misaligned legs. Given that evidence, the court did not clearly err by finding the misaligned legs were at most a contributing cause—and certainly not an independent cause—of the loss of the Hilcorp contract.

Seahawk advances several unpersuasive theories that even if the misaligned legs and defective hydraulic-jacking system combined to cause the loss of the contract, the concurrent-cause doctrine should not apply. First, according to Seahawk, the doctrine should not apply because the Contract Provision does not explicitly invoke it. That is a non-starter, because the concurrent-cause doctrine applies whenever a policy delineates covered and excluded perils and such perils combine to cause a loss.

Second, Seahawk avers that the loss of a contract is different from physical damages to which the doctrine typically applies. That notion, for which no caselaw is cited, overlooks the fact that the Contract Provision requires that the loss of contract be the result of physical damages that are recoverable under the general-coverage provision. It would be entirely consistent with the concurrent-cause doctrine for Seahawk to prove what proportion of the physical damages that led to the loss of contract are attributable to a covered peril and for the insurers to pay out the Contract Provision according to that proportion.

Finally, Seahawk avers that the concurrent-cause doctrine would require it to prove a claim "payable" under the Policy's general coverage provision rather than one "recoverable . . . if the deductible were nil." Seahawk contends that all it must show to recover is some theoretically covered physical damage that contributed to a loss of contract. Seahawk elides the principle that compliance with the concurrent-cause doctrine, under Texas law, is a prerequisite

14

No. 15-30324

to any recovery whatsoever. *See Wallis*, 2 S.W.3d at 303 (noting that allocation of damages is central to the insured's claim). When, as here, a covered peril and excluded peril combine to cause a loss, no amount of damages is even *recoverable*[15]—let alone payable—until the insured complies with the concurrent-cause doctrine. *Id.* at 302–03 ("[T]he insured is entitled to *recover* only that portion of the damage caused solely by the covered peril(s)." (emphasis added)). The district court properly applied the concurrent-cause doctrine to the Contract Provision.

The final point, that Seahawk did not meet its burden under the concurrent-cause doctrine, is without controversy. Seahawk presented no evidence to segregate the damage attributable solely to the misaligned legs (the covered peril) as compared to the defective hydraulic-jacking system (the excluded peril). "Although [an insured] is not required to establish the amount of his damages with mathematical precision, there must be some reasonable basis upon which the [fact finder's] finding rests." *Id.* at 304. Seahawk failed to meet its burden under the concurrent-cause doctrine because it presented no evidence to apportion damages between covered and excluded perils, so the district court properly denied the claim under the Contract Provision.

AFFIRMED.

---

[15] *See* BRYAN A. GARNER, DICTIONARY OF LEGAL USAGE 758 (3d ed. 2011) ("recoverable = compensable. . . . 'capable of being legally obtained.'"). Seahawk's reference to *California Insurance Guarantee Association v. Liemsakul*, 193 Cal. App. 3d 433 (Cal. Ct. App. 1987), does not change this conclusion; it stands for the uncontroversial proposition that "recoverable" means "recovery that might have been possible" rather than that which is "actually recovered." Agreeing as we do with that proposition, a claim for damages under Texas law, where a covered peril and excluded peril combine to cause the loss, is not even *recoverable* unless and until the insured complies with the concurrent-cause doctrine.