**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 17-20812

United States Court of Appeals
Fifth Circuit

**FILED**

November 19, 2018

Lyle W. Cayce
Clerk

EVANSTON INSURANCE COMPANY,

Plaintiff - Appellee

v.

MID-CONTINENT CASUALTY COMPANY,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, CLEMENT, and SOUTHWICK, Circuit Judges.

EDITH B. CLEMENT, Circuit Judge:

This is a dispute between a primary liability insurer and an excess liability insurer over the number of "accidents" that took place under an insurance policy. Over a ten-minute period on November 15, 2013, the insured's Mack truck struck (1) a Dodge Ram, (2) a Ford F150, (3) a Honda Accord, (4) a toll plaza, and (5) a Dodge Charger. The insurers' disagreement focuses on the final three collisions. In previous state court litigation, multi-million-dollar settlements were reached between the various claimants and the insurance companies. But the Mack truck's primary insurer refused to contribute more than $1 million toward the settlements of the final three collisions, claiming that they were part of a single "accident" under its policy

No. 17-20812

and that $1 million was the primary insurer's limit of liability per accident. The excess insurer sued the primary insurer in federal district court. The parties stipulated to the facts and filed cross motions for summary judgment as to whether the final three impacts constituted a single "accident" or separate "accidents" under the policy and Texas law. Although the district court held that two accidents occurred, we reverse because there was only one.

## I.

Since the case was submitted below on a stipulation, there is no dispute as to the material facts. Mid-Continent Casualty Company issued a commercial auto insurance policy to Global Waste Services, LLC. The policy had a $1 million per-accident limit of insurance and required Mid-Continent to defend Global until the policy limit was exhausted. The policy provides in relevant part:

**SECTION II — LIABILITY COVERAGE**

**A.     Coverage**

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

> . . .

**C.     Limit of Insurance**

> Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for the total of all damages and "covered pollution cost or expense" combined resulting from any one "accident" is the Limit of Insurance for Liability Coverage shown in the Declarations.

2

No. 17-20812

> All "bodily injury", "property damage" and "coverage pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".
>
> . . .

**SECTION V — DEFINITIONS**

> **A.**     "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

In addition to the primary insurance policy, Global held an excess liability policy from Evanston Insurance Company with a $5 million per-accident liability limit. We are concerned with the terms of the primary insurance policy.

On November 15, 2013, a Global employee named Marlon Diggs lost control of his Mack truck on North Beltway 8 in Houston. Witnesses say that Diggs was driving the truck erratically. At approximately 11:04 a.m., the Mack truck hit a Dodge Ram in the 800 block of North Beltway 8. Three minutes later, the Mack truck struck a Ford F150 in the 2500 block of North Beltway 8. Two minutes after that, the Mack truck approached a toll plaza and caused the series of collisions which are at issue.

At approximately 11:09 a.m., the Mack truck struck a Honda Accord that was waiting in line at the toll plaza in the 3300 block of North Beltway 8. Joseph Williams was driving the Accord and his wife, Laurie Williams, was the only passenger. The Mack truck pushed the Accord forward more than one hundred feet into the crash attenuator barrels separating two toll lanes, where the Accord came to rest perpendicular to the road. Although Joseph Williams was not seriously injured in the collision, Laurie Williams sustained severe injuries.

No. 17-20812

Once separated from the Accord, the Mack truck continued to travel through the automatic toll lane for approximately sixty-six feet before striking a Dodge Charger driven by Gwenetta Powell. While travelling through the lane, the Mack truck struck the tollbooth, causing significant damage. After impacting the Charger, the Mack truck continued pushing the Charger until it crashed into the right-side retaining wall, pinning the Charger between the Mack truck and the wall. At some point between the Mack truck's impact with the Charger and the vehicles coming to rest against the wall, Diggs fell out of the truck. Diggs did not apply the brakes at any time from first striking the Accord until the Mack truck crashed into the retaining wall. Powell and Diggs both died in the accident.

Relatives of Powell sued Global in state court, and the Williams family intervened. Additionally, Harris County made demands on Global for the cleanup and repair of the toll plaza. All the claims ultimately settled. The Williams family received $4.5 million—approximately $1 million from Mid-Continent and the remaining $3.5 million from Evanston. Mid-Continent withdrew from the litigation after settling with the Williams family, claiming exhaustion of its policy limit. Evanston then settled with the Powells and Harris County for $2.1 million and $75,000, respectively. Mid-Continent did not contribute to either settlement.

Evanston filed suit in federal court in Texas seeking reimbursement from Mid-Continent for a portion of the payments Evanston made on behalf of Global. Evanston also sought to recover the entirety of its defense costs. The parties stipulated to the relevant facts and filed cross motions for summary judgment. Evanston argued that Mid-Continent incorrectly construed all the collisions occurring after the Mack truck's impact with the Accord to be a single

4

"accident."[1] According to Evanston, each separate impact between the Mack truck and another vehicle or object constituted a separate accident subject to separate liability limits. Mid-Continent asserted that under Texas law, there was only one accident because the only event that gave rise to the various injuries was Diggs's negligence.

The district court referred the motions to a magistrate judge, who concluded that under the policy language two accidents occurred. According to the magistrate, "[t]he collisions between the Mack truck and the Honda Accord and between the Mack truck and the Dodge Charger were separate accidents because they occurred independently, the former did not lead to the occurrence of the latter." The district court adopted the magistrate's recommendation over Mid-Continent's objection. The court entered judgment in favor of Evanston. The court concluded that Mid-Continent should have paid out a total of about $2,045,000 under the various settlements. Because Mid-Continent only paid $1 million in the underlying state litigation, the district court ordered it to pay Evanston about $1,045,000 plus the costs of Evanston's defense. Mid-Continent appeals that ruling.

## II.

Because this case is before the court on cross motions for summary judgment, we review the district court's rulings de novo and construe all evidence and inferences in favor of the non-moving parties. *LCS Corr. Servs., Inc. v. Lexington Ins. Co.*, 800 F.3d 664, 669 (5th Cir. 2015). The parties agreed below that the only question was whether the Mack truck's collisions near the toll plaza constituted one "accident" or multiple "accidents" under the language of the policy. The interpretation of the word "accident" as used in the insurance

---

[1] As for the two collisions which occurred before the Mack truck hit the Accord, neither the district court nor the parties discuss them, probably because the damage was minor and the excess coverage not implicated.

No. 17-20812

contract is a question of law, which the court reviews de novo. *Ran-Nan Inc. v. Gen. Accident Ins. Co. of Am.*, 252 F.3d 738, 739 (5th Cir. 2001) (per curiam).

### III.

The parties agree that Texas law governs this diversity action and informs the interpretation of the Mid-Continent insurance policy. Under Texas law, the court must construe the policy according to the general rules of contract construction to give effect to the parties' intent. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). Courts begin with the language of the contract "because we presume parties intend what the words of their contract say." *Id.* "The policy's terms are given their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense." *Id.* "If the court is uncertain as to which of two or more meanings was intended, a provision is ambiguous." *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh (HEB)*, 150 F.3d 526, 529 (5th Cir. 1998).

### A.

The policy defines "accident" to include "continuous or repeated exposure to the same conditions resulting in 'bodily injury' or 'property damage.'" Under the "Limit of Insurance" provision, the policy states that "[r]egardless of the number of covered 'autos,' 'insureds,' premiums paid, claims made or vehicles involved in the 'accident,'" the most Mid-Continent would pay for "the total of all damages . . . resulting from any one 'accident'" was the policy limit of $1 million. Although the parties disagree on its meaning, neither Mid-Continent nor Evanston argues the policy is ambiguous. And Texas courts routinely interpret the term "accident" or its equivalent without finding ambiguity. *HEB*, 150 F.3d at 529.

In fact, the policy's definition of "accident" is virtually identical to the definitions in other commercial liability policies. *See id.* at 529. Some insurance policies use the term "occurrence" instead of "accident," but both terms are usually defined as "continuous or repeated exposure to conditions," and policies frequently provide that all damage or injury "arising out of continuous or repeated exposure" to the same conditions is considered to have arisen from the same accident or occurrence. There are sometimes small differences between definitions, but they are usually not significant.

For example, some policies define an accident or occurrence to include all injuries "resulting from the same general conditions," *Foust v. Ranger Ins. Co.*, 975 S.W.2d 329, 333 (Tex. App. 1998); others refer to all injuries "arising out of . . . substantially the same general conditions," *HEB*, 150 F.3d at 529; and still others encompass all injuries "resulting from . . . substantially the same conditions." Evanston argues that a policy's use of the phrase "same conditions" instead of "same general conditions" requires a stricter similarity in the conditions to establish a single accident. This is likely incorrect. Texas recognizes that policies which define "occurrence" in the manner described above are to be interpreted more broadly than policies which leave occurrence undefined. *See Foust*, 975 S.W.2d at 334–35. And we have noted before that these types of definitions are "virtually identical." *See, e.g.*, *HEB*, 150 F.3d at 529. That the policy does not include the word "general" should not normally affect the analysis, and it does not affect the result here.

**B.**

In any event, Texas applies the same approach—the "cause" approach—to interpreting all such provisions. Although the Supreme Court of Texas has never said so, we have repeatedly observed that "Texas courts agree that the proper focus in interpreting 'occurrence' is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious

effects." *HEB*, 150 F.3d at 530. But while every case which addresses this topic acknowledges the same standard, different courts have sometimes understood that standard to mean different things.

Certain other jurisdictions, such as Louisiana, have adopted an "effects" approach to interpreting insurance policies in which each separate claim arising from the insured's negligence is considered a separate occurrence. *Pennzoil-Quaker State Co. v. Am. Int'l Specialty Lines Ins. Co.*, 653 F. Supp. 2d 690, 704 n.4 (S.D. Tex. 2009). The "cause" approach simply tells us that the "effects" approach is not appropriate under Texas law. The cause test is not clear regarding which cause or causes are supposed to count.

Federal courts attempting to understand the "cause" test typically begin with our decision in *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.*, 447 F.2d 204 (5th Cir. 1971). Pincoffs, the insured, unknowingly imported bird seed that had been contaminated in Argentina. Pincoffs then sold the seed to eight different dealers, who in turn resold it to bird owners. The birds that ate the contaminated seed died, and their owners sued. The policy at issue in *Pincoffs* defined "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* at 206. We held "that the 'occurrence' to which the policy must refer is the occurrence of the events or incidents for which Pincoffs is liable." *Id.* We reasoned that the incidents that subjected Pincoffs to liability were the eight sales, therefore there had been eight "occurrences" under the policy. *Id.* at 207.

This approach has sometimes been called the "liability-triggering event" test. Despite occasional disagreement as to whether the test is conceptually distinct from the "cause" test, the *Pincoffs* approach has become widely accepted following its endorsement by a Texas appellate court in *Goose Creek Consol. ISD v. Cont'l Cas. Co.*, 658 S.W.2d 338 (Tex. App. 1983). In *Goose Creek*,

an arsonist set fire to two schools in the same school district. Although the same arsonist was the but-for cause of both fires, the fires occurred several blocks and at least two hours apart, and neither caused the other. *Id.* at 339. Hoping to pay a single deductible, the school district argued that the fires should be treated as a single occurrence because both arose from the same "unbroken chain of events." *Id.* After citing to *Pincoffs*, the court disagreed, concluding there were two occurrences because the "two fires [were] distinguishable in space and time and . . . one did not cause the other." *Id.* at 340–41.

*Pincoffs* and *Goose Creek* clarified that to determine the number of occurrences under a policy, we count the number of acts by the insured which gave rise to liability. This clarification is helpful, but incomplete. It leaves unanswered the question of at what level of generality we define the insured's actions. In *HEB*, we answered that question by placing the emphasis on unbroken proximate causation. "While a single occurrence may result in multiple injuries to multiple parties over a period of time," we recognized in *HEB* that "if one cause is interrupted and replaced by another intervening cause, the chain of causation is broken and more than one occurrence has taken place." *HEB*, 150 F.3d at 534 (quotations omitted). In other words, unless the proximate cause for the injuries is continuous and unbroken, there must be more than one occurrence.

In *HEB*, this court applied that rule to conclude that an HEB employee's sexual abuse of two different children, a week apart, at an HEB store constituted two separate occurrences under HEB's insurance policy. *Id.* at 535. Hoping to limit liability under its self-insurance, HEB had claimed there was only one occurrence because both incidents arose from its ongoing negligent supervision of the same employee. Rejecting that reasoning, we explained that Texas courts would not ignore the "immediate" cause of each child's injury in

favor of the "underlying negligent supervision" when counting occurrences. *Id.* at 530. Because it was the two independent acts of sexual abuse and not the underlying negligent supervision that "gave rise to HEB's separate and distinct liability" to each child, two separate occurrences had taken place under the policy. *Id.* at 531.

*HEB* has sometimes been misunderstood, including by the district court in this case. Some courts have interpreted *HEB* to mean that a so-called overarching cause can *never* constitute a single occurrence. They say courts must instead identify the "immediate cause" of the injuries. *See Pennzoil-Quaker State Co. v. Am. Int'l Specialty Lines Ins. Co.*, 653 F. Supp. 2d 690, 705–06 (S.D. Tex. 2009) ("When there is more than one immediate cause of events giving rise to an insured's liability in an underlying lawsuit, courts have rejected the argument that there is a single 'occurrence' based on continuous 'exposure' to the insured's alleged negligence."); *Esparza v. Eagle Express Lines, Inc.*, No. 4:05-CV-315, 2007 WL 969585, at *10 (E.D. Tex. Mar. 28, 2007) ("[I]t was each collision in the instant case that created the continuous or repeated exposure to the same, or substantially the same, conditions, not the fact that the tractor-trailer crossed the median.").

But what we actually said in *HEB* was "that when the underlying basis for liability is negligent supervision, yet the damage is caused by an intervening intentional tort, the court cannot look past the *immediate cause* of the damage for purposes of the insurance policy." *HEB*, 150 F.3d at 531 (emphasis added). So although the district court construed *HEB* to mean that the "overarching cause" of the injuries must always be ignored for occurrence purposes, properly understood, *HEB* merely suggests that an overarching cause should be ignored where an intervening cause—like an intentional tort—breaks the chain of causation. As *HEB* itself recognized: if there was "but one proximate, uninterrupted, and continuing cause which resulted in all of the

injuries and damage," then there was one occurrence. *Id.* at 534 (quotations omitted).

This understanding is confirmed both by Texas case law and by our most recent decisions. The seminal Texas case on the topic is *Foust*. In *Foust*, a farmer hired a pilot to crop dust his fields with herbicide. Some of the herbicide drifted onto neighboring tracts of land, damaging the neighbors' crops. *Foust*, 975 S.W.2d at 331. The neighbors and the pilot's insurer disputed how many occurrences had taken place under the policy, which defined "occurrence" to mean "a sudden event or repeated exposure to conditions involving the aircraft during the policy period." *Id.* at 333 (emphasis omitted). The policy also provided that all "bodily injury or property damage resulting from the same general conditions will be considered to be caused by one occurrence." *Id.* (emphasis omitted).

The crop dusting took almost three hours, and the neighbors argued that a finding of a single "occurrence" was inappropriate. They emphasized that the plane had landed several times to refuel during that period, and that the temperature, wind, and altitude varied during the several passes over different sections of the property. *Id.* But the Texas appellate court disagreed that those changes were significant. *Id.* at 335. Focusing on the plain meaning of the policy language, it instead concluded that all of the damage had been caused by "repeated exposure to the same general conditions—the drift of a herbicide which was being applied to crops on adjoining property." *Id.* It was the crop dusting process which had damaged the neighboring tracts, and the fact that the "single procedure" required the plane to land intermittently or change altitude did not affect the continuous nature of the crop dusting. *Id.*

In other words, because the court in *Foust* considered all the injuries to have been caused by the same continuous negligence of the insured, there was only one occurrence under the policy. This court recently reaffirmed that

principle in *Seahawk Liquidating Trust v. Certain Underwriters at Lloyds London*, 810 F.3d 986 (5th Cir. 2016). In *Seahawk*, the court considered whether there had been one occurrence or two where a drilling rig sustained damage in a February storm that was then a contributing factor to the rig's malfunction and further damage after a July storm. The policy defined "occurrence" to include "a sequence of losses or damages arising from the same occurrence." *Id.* at 991. The insurers argued that each storm was a separate occurrence because the damage caused by the February storm was not a proximate cause of the damage which occurred after the July storm.

Focusing on the decisions in *Goose Creek* and *HEB*, this court agreed with the insurers. We held that "[w]hen an occurrence is technically defined to include a series of losses arising from the same event, it includes only those losses *proximately caused* by that event." *Id.* at 993. We again rejected reliance on the "overarching cause" or on pure but-for causation, clarifying that the focus should instead be "on the direct, immediate, and proximate cause of the losses to determine the number of occurrences." *Id.* at 992–93. Because the district court did not clearly err by finding that the July storm was an intervening cause of the losses, this court agreed that two occurrences had taken place under the policy. *Id.* at 994; *see also U.E. Texas One-Barrington, Ltd. v. Gen. Star Indem. Co. (General Star)*, 332 F.3d 274, 282 n.7 (5th Cir. 2003) (Smith, J., concurring in part and dissenting in part) (recognizing that "[s]ome courts have suggested that an intervening cause might change the number of occurrences").

As articulated in *HEB, Foust*, and *Seahawk*, the appropriate inquiry is whether there was one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage. If so, then there was a single occurrence. If the chain of proximate causation was broken by a pause in the negligent conduct or by some intervening cause, then there were multiple

No. 17-20812

occurrences, even if the insured's negligent conduct which caused each of the injuries was the same kind of negligent conduct.

## C.

With these principles in mind, reversal of the district court is clearly appropriate. The district court based its decision on a misunderstanding of the case law. In short, the court believed that the "overarching cause" of injuries can never constitute a single occurrence under Texas law, and instead attempted to identify the "immediate causes" of the injuries that gave rise to the insured's liability. Because the insured did not become liable to anyone until his Mack truck collided with their vehicle, the court conceptualized each collision as a separate event giving rise to liability. That was a mistake.

Texas law only prohibits courts from looking to the "overarching cause" of the injuries when the overarching cause is not a "proximate, uninterrupted, and continuing cause" of all the injuries. *See HEB*, 150 F.3d at 534. "To proximately cause an injury, an actor need not be the last cause, or the act immediately preceding the injury." *J. Wigglesworth Co. v. Peeples*, 985 S.W.2d 659, 663 (Tex. App. 1999). The appropriate question is whether the continuous negligence of the Mack truck driver was interrupted and the chain of causation broken. *Cf. Foust*, 975 S.W.2d at 335 (finding one occurrence where the insured's crop dusting was a "single procedure"); *Pincoffs*, 447 F.2d at 206 (finding multiple occurrences because there were separate negligent sales).[2]

---

[2] The district court also does an unconvincing job of distinguishing *Twin City Fire Ins. Co. v. Ill. Nat'l Ins. Co.*, No. 1:11–cv–00144–SS, LEXIS 197629 (W.D. Tex. Mar. 12, 2012), a case in which a defect in the insured's road construction caused three separate car accidents on different days. The court held that the three accidents constituted a single occurrence, emphasizing the broad language of the policy and that all the injuries were proximately caused by a single negligent act of the insured: the defective road construction. *Id.* at *7. That result would be consonant with the approach described here. *Cf. General Star*, 332 F.3d at 278 (finding nineteen occurrences where water leaks in nineteen apartment buildings were caused by

No. 17-20812

The chain of causation remained unbroken on these facts. The ongoing negligence of the runaway Mack truck was the single "proximate, uninterrupted, and continuing cause" of all the collisions. After all, the parties agree that Diggs did not apply the brakes at any time from first striking the Accord until all the vehicles came to rest. The language of the contract provides that all injuries—no matter the number of vehicles involved or the number of claims made—arising from continuous or repeated exposure to substantially the same conditions are considered a single accident. The broad language of the policy must be given effect. *See Foust*, 975 S.W.2d at 335. Absent any indication that the driver regained control of the truck or that his negligence was otherwise interrupted between collisions (and we have no such indication), all of the collisions resulted from the same continuous condition—the unbroken negligence of the Mack truck driver. There was therefore one "accident" under the policy.

We REVERSE the district court and RENDER judgment in favor of Mid-Continent.

---

nineteen separate negligent plumbing installations, not a single negligent plumbing installation).

14