

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00245-CV

———————————————

ZURICH AMERICAN INSURANCE COMPANY, AS SUCCESSOR BY MERGER TO MARYLAND CASUALTY COMPANY, Appellant

V.

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, AS SUCCESSOR TO BURLINGTON NORTHERN RAILROAD COMPANY, AND AS SUCCESSOR IN INTERESTS TO GREAT NORTHERN RAILWAY COMPANY, Appellee

On Appeal from the 352nd District Court
Tarrant County, Texas
Trial Court No. 352-287082-16

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

Vermiculite is a mineral with many commercial uses, such as insulation, roofing, and soil conditioning. Not all vermiculite ore contains toxic asbestos minerals, but some does. The present insurance-coverage dispute involves asbestos-contaminated vermiculite mined from the eponymous Vermiculite Mountain outside of Libby, Montana.

Appellant Zurich American Insurance Company[1] argues that the trial court should not have granted Appellee Burlington Northern and Santa Fe Railway Company's[2] summary-judgment motion or denied Zurich's two summary-judgment motions concerning Zurich's duty to defend BNSF from and against Libby residents' suits claiming bodily injury from exposure to asbestos-contaminated vermiculite from BNSF's operations at a vermiculite-loading facility near Libby. Applying Texas's eight-corners rule, we hold that that the trial court correctly determined that the allegations in the pleadings BNSF filed as summary-judgment evidence established Zurich's duty to defend under Zurich's premises–operations coverage and did not conclusively establish the completed–operations exclusion.

---

[1]We will use Zurich for both Zurich American Insurance Company and its predecessor, Maryland Casualty Company.

[2]We will use BNSF for Burlington Northern and Santa Fe Railway Company, as well as its predecessor entities.

We further hold that although the trial court erred by declaring that each individual Libby claimant had alleged a separate accident or exposure under the policy coverage at issue—we hold that there was but a single accident or occurrence—the trial court correctly determined that Zurich did not raise a genuine issue of material fact (1) on policy-limits exhaustion or (2) the right to recoup its previously expended defense costs. Thus, we affirm in part and reverse in part.

## I. Factual and Procedural Background

### A. Vermiculite-mining operations occurred near Libby, Montana.

For decades, W.R. Grace & Company[3] mined and transported vermiculite from Vermiculite Mountain. To aid its operations, between 1938 and 1995, Grace entered into a series of agreements with BNSF that (1) resulted in constructing a loading dock, suspension bridge, and conveyor belt over BNSF's right of way and tracks four miles east of Libby (the "River Loading Facility"[4]) and (2) enabled Grace to load its vermiculite into BNSF's rail cars for transport. Grace agreed to indemnify BNSF and to purchase "liability . . . insurance protecting [BNSF] against loss . . . arising out of

---

[3]W.R. Grace & Company and its predecessors, including the Zonolite Company, originally owned and operated the mine. For ease and clarity, we refer to W.R. Grace & Company and its predecessors as Grace.

[4]In the trial court and on appeal, Zurich has used the term the "Loading Dock," and BNSF has used the term "River Loading Facility" to refer to the agreed-upon "premises" or "insured premises." For consistency, we will use River Loading Facility.

the use of said premises or arising out of the construction, maintenance, use and removal of said suspension bridge and conveyor belt."

**B. Grace procured Zurich's premises–operations liability insurance covering the River Loading Facility for 1965 through 1974.**

Per its agreement, Grace bought three three-year "Owners', Landlords', and Tenants' Liability" insurance policies from Zurich for 1965 through 1974 for BNSF's benefit (the OL&T policies).[5] Each policy named BNSF as the named insured and defined the "premises" or "insured premises" to be the River Loading Facility.[6]

The 1965 policy provided defense and indemnity for bodily injury "caused by accident" and arising out of the "Premises–Operations" hazard, a term defined as the "ownership, maintenance or use of the premises, and all operations necessary or incidental thereto." Similarly, the 1968 and 1971 policies provided defense and indemnity for bodily injury "caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental thereto." The 1968 and 1971 policies defined "occurrence" as "an accident, including injurious exposure to conditions, which result[ed], during the policy period,

---

[5]The parties have not located complete copies of the OL&T policies, but they have stipulated to those policies' existence and terms. Grace also obtained additional, different types of coverage from other insurers.

[6]We discuss the OL&T policies in greater detail in Section III.B.1 below, but we provide an upfront overview.

4

in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

All three policies excluded from coverage bodily injury arising from "Products–Completed–Operations" and "operations on or from premises, other than [the River Loading Facility], which are owned by, rented to or controlled by [BNSF]." The policies had liability limits of $100,000 "per person" and $500,000 "per accident" (for the first policy) or "per occurrence" (for the latter two policies) with no aggregate limit.

### C. Libby vermiculite claimants have filed personal-injury suits that have spawned protracted insurance-coverage litigation.

Fast forward to the late 1990s and early 2000s when current and former Libby residents started suing Grace, BNSF, and others, alleging that they had ingested dust from asbestos-laced vermiculite from Grace's vermiculite-mining operations, resulting in such asbestos-related diseases as asbestosis, mesothelioma, and lung cancer. Protracted litigation has ensued, leading to Grace's 2001 bankruptcy; we need not delve into all the litigation's details.

But some of the prior litigation bears on the issues before us. Notably, in 2003 BNSF sued certain of its commercial general-liability insurers in Tarrant County, Texas, taking the position that the Libby vermiculite claims were covered under the CGL insurers' policies and that the claims constituted but one occurrence—no matter how many individual claimants had sued BNSF. Taking this position potentially

5

enabled BNSF to maximize its insurance coverage because some of its excess CGL policies—with potential coverage up to $200 million per occurrence for each year or policy period—required BNSF to pay a high self-insured retention per occurrence. Because BNSF and its CGL insurers settled, no court resolved the legal issue of whether there was only one occurrence.

**D. BNSF and Zurich became entwined in multi-state litigation.**

Meanwhile, after BNSF learned of the Zurich OL&T policies in 2005, BNSF began tendering then-pending Libby vermiculite lawsuits to Zurich in early 2006 for defense and indemnity, and Zurich agreed to defend BNSF. In 2012, Zurich, along with other BNSF insurers, settled with over 1,000 Libby claimants. As part of the 2012 settlement, BNSF and its insurers contributed to a settlement fund. The confidential settlement agreement called for a collective $18 million contribution from BNSF's insurers, but it left the insurers to separately agree how to allocate their respective shares of the total settlement contribution, which they did by a separate agreement.

Even BNSF did not initially know the allocation, but it eventually learned that Zurich had contributed $5.4 million. Zurich later notified BNSF that this total amount equaled $500,000 per year—the yearly per-accident or per-occurrence liability limit—for each of the nine years of the Zurich OL&T policies plus an additional $900,000 in defense costs; thus, Zurich asserted that it had paid the policy limits for all three policies and had no further obligations under them. If true, this position—

premised on a one-occurrence stance—would end Zurich's duty to defend under the OL&T policies. BNSF disputed that Zurich's contribution to the 2012 settlement (1) had been allocated as Zurich asserted, (2) had exhausted the policies' limits, or (3) had relieved Zurich of its continuing defense-and-indemnity obligation.

As BNSF has continued to face more Libby vermiculite lawsuits in Montana courts—with the one-occurrence question left unresolved—BNSF and its insurers have continued litigating. In 2014, BNSF filed a declaratory-judgment action in Yellowstone County, Montana, against three of its insurers (including Zurich and Arrowhead Indemnity Company), disputing whether their policies' per-occurrence liability limits had been exhausted.

Then, in 2016, Arrowhead filed the underlying dispute in Texas against BNSF and numerous of BNSF's other insurers, including Zurich.[7] In this Texas case, Arrowhead noted BNSF's change in position on the one-occurrence issue and argued that Arrowhead had exhausted its limits and owed no duty to defend or indemnify BNSF. Arrowhead also sued BNSF's other insurers—including Zurich—for contribution and to resolve cost-sharing issues.

---

[7]BNSF (and other defendants) initially filed a motion to stay the underlying suit because of the Montana proceeding, which Arrowhead opposed, but the underlying Texas suit has obviously proceeded, and it is unclear whether the Montana case is still pending.

**E. BNSF and Zurich filed competing motions for summary judgment, and the trial court ultimately granted BNSF's requested relief.**

BNSF and Zurich filed crossclaims for declaratory relief and are the only remaining parties for purposes of this appeal.[8] BNSF initially pleaded that over 1,400 Libby vermiculite claims were pending against it; it eventually presented evidence of around 400 Libby Lawsuits, some of which had multiple plaintiffs (the "Libby Lawsuits"). BNSF sought a judicial determination that Zurich had a duty to defend and indemnify BNSF under Zurich's OL&T policies for the Libby Lawsuits and similar future lawsuits.

Among other things, Zurich responsively pleaded that (1) the Libby Lawsuits did not involve bodily-injury claims arising out of the River Loading Facility and (2) the payments it had made toward the 2012 settlement exhausted the OL&T policies' limits, relieving it of any further duty. Zurich claimed that it had provisionally defended BNSF against the Libby Lawsuits, subject to a reservation of rights, including the right to recoup its defense costs.[9] Zurich requested a declaration that it

---

[8]The trial court's Final Judgment states that it disposed of all claims and parties in the underlying suit and is an appealable final judgment. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195, 200 (Tex. 2001).

[9]Although Zurich's second amended pleadings mentioned its recoupment right, Zurich amended its pleadings to expressly include the right under its first cause of action seven days before a summary-judgment hearing on that claim. BNSF objected to the amendment, but Zurich's third amended pleadings were timely filed under the operative agreed-upon scheduling order, which stated that "[a]ny matter not expressly addressed in th[e] Agreed Scheduling Order shall be controlled by the applicable rule of civil procedure or other law." *See* Tex. R. Civ. P. 63. Also, the "Agreed Order on

8

did not have a duty to defend or to indemnify BNSF for the Libby Lawsuits and was entitled to recoupment of defense costs.

BNSF and Zurich filed competing summary-judgment motions, three of which are relevant to this appeal. In one motion, BNSF requested partial summary judgment on Zurich's duty to defend and argued that the OL&T policies provided coverage for the Libby Lawsuits, which involved claims of bodily injury arising out of the River Loading Facility. BNSF also moved for summary judgment on Zurich's exhaustion affirmative defense, arguing that Zurich's duty to defend was not extinguished by payment of prior settlements. BNSF sought declarations that (1) Zurich had issued the OL&T policies, (2) Zurich had a duty to defend BNSF from and against the pending Libby Lawsuits—and future lawsuits alleging bodily injury from asbestos exposure originating from the River Loading Facility—under the policies, (3) each Libby Lawsuit plaintiff had alleged unique exposure that constituted a separate accident or occurrence, and (4) BNSF was "entitled to recover from Zurich all fees and costs that BNSF ha[d] incurred and will incur defending the Libby Lawsuits."

Zurich filed two responsive summary-judgment motions. In one motion concerning the OL&T policies' scope of coverage, Zurich argued that it owed no duty to defend BNSF for any Libby vermiculite claimant who did not allege liability based on the River Loading Facility or who alleged bodily injury for "'completed-operations'

Joint Motion to Sever and Abate" reflects that Zurich's third amended pleadings were its operative pleadings.

including any liability resulting from activity beyond the [River Loading Facility]." Zurich also argued that none of the Libby Lawsuits "involve[d] a plaintiff who claim[ed] to have suffered an injury while on the [River Loading Facility]."

In its other motion, Zurich raised three main summary-judgment grounds. First, Zurich argued that BNSF was subject to several estoppel-based affirmative defenses: that is, because BNSF had argued for the single-accident-or-occurrence position in prior Libby vermiculite litigation, BNSF should not be permitted to take the contrary position in its coverage dispute with Zurich. Second, Zurich argued that because there was but one accident or occurrence and it had exhausted its policy limits, it owed no further duty to defend BNSF. Third, Zurich sought a declaration that it had the right to recoup any post-exhaustion defense costs it had paid in defending the Libby vermiculite claims.

The trial court granted BNSF's motion,[10] denied Zurich's motions, and signed a final judgment that included the following declarations:

A. Zurich issued [the OL&T policies];

B. Zurich has a duty to defend BNSF from and against the lawsuits identified in Exhibit D-1 to BNSF's Motion for Summary Judgment which allege asbestos exposure or potential asbestos exposure between

---

[10]Although the Final Judgment indicated that it had granted BNSF's motion in its entirety, the Final Judgment made no declaration about Zurich's duty to defend BNSF from and against future lawsuits alleging bodily injury caused by exposure to asbestiform amphiboles originating from the River Loading Facility, which BNSF requested in its motion. The trial court signed BNSF's proposed final judgment, and BNSF raises no complaint on appeal about the final judgment.

April 20, 1965 and April 20, 1974, or which are silent as to the date of exposure (the "Libby Lawsuits");

C.  Each [p]laintiff's alleged exposure in the Libby Lawsuits constitutes a separate accident or occurrence; and,

D.  BNSF is entitled to recover from Zurich all fees and costs that BNSF has incurred and will incur defending the Libby Lawsuits.

By separate agreement and order, BNSF and Zurich severed and abated their respective claims for declaratory judgment on Zurich's duty to indemnify BNSF and their claims for attorneys' fees.

## II. Standard of Review

A party is entitled to summary judgment when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tex. R. Civ. P. 166a(c). "We review summary judgments de novo . . . ." *Weekley Homes, LLC v. Paniagua*, 691 S.W.3d 911, 915 (Tex. 2024). "When both parties move for summary judgment and the trial court grants one motion and denies the other, we review all the summary judgment evidence, determine all of the issues presented, and render the judgment the trial court should have." *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017) (quoting *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013)).

A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). A defendant is entitled to summary

11

judgment on an affirmative defense if it conclusively proves all the elements of that defense. *Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008); *see* Tex. R. Civ. P. 166a(b), (c).

Where a defendant relies on an affirmative defense to defeat summary judgment, the defendant has the burden to present evidence sufficient to raise a fact issue on each element of the affirmative defense. *See Am. Petrofina, Inc. v. Allen*, 887 S.W.2d 829, 830 (Tex. 1994); *H & H Steel Fabricators, Inc. v. Wells Fargo Equip. Fin., Inc.*, No. 02-15-00391-CV, 2016 WL 6277371, at *4 (Tex. App.—Fort Worth Oct. 27, 2016, no pet.) (mem. op.). Merely pleading an affirmative defense will not, without more, defeat a motion for summary judgment. *See Am. Petrofina*, 887 S.W.2d at 830; *H & H Steel Fabricators, Inc.*, 2016 WL 6277371, at *4.

In reviewing a declaratory judgment, we refer to the procedure for resolving the issue at trial to determine the applicable standard of review on appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.010; *English v. BGP, Int'l Inc.*, 174 S.W.3d 366, 370 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Here, the trial court resolved the declaratory judgment issue on competing summary-judgment motions, so we review the propriety of the trial court's grant of the declaratory judgment under the same standards applicable for review of summary judgments noted above. *English*, 174 S.W.3d at 370.

## III. Zurich's Duty to Defend

We first take up Zurich's fourth appellate issue because it concerns the underlying question of whether the trial court correctly determined that Zurich has a duty to defend BNSF from and against the claimants in the Libby Lawsuits based on the policy language. In that issue, Zurich argues that the trial court erred by granting BNSF's summary-judgment motion and denying Zurich's cross-motion on Zurich's duty to defend. Comparing the four corners of the OL&T policies to the four corners of the complaints in the Libby Lawsuits—and ignoring the voluminous evidence both sides presented from experts, corporate representatives, and other sources—we conclude that the trial court did not err by determining that the allegations in the Libby Lawsuits fall within the OL&T policies' premises–operations coverage, triggering Zurich's duty to defend.

### A. Policy Construction and the Duty to Defend

The parties agreed in their summary-judgment motions that the standards governing policy construction and Zurich's duty to defend are the same under Texas and Montana law. We therefore construe the OL&T policies and analyze Zurich's duty to defend under Texas law. *See Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 685 (Tex. 2006) (agreeing that Texas courts "can presume that the determinative law of another state is the same as Texas law absent proof or argument to the contrary").

We interpret insurance policies under the same general rules of construction applicable to contracts. *Monroe Guar. Ins. v. BITCO Gen. Ins.*, 640 S.W.3d 195, 198 (Tex. 2022) (citing *Richards v. State Farm Lloyds*, 597 S.W.3d 492, 497 (Tex. 2020)). Our primary goal is to effectuate the parties' intent as expressed in the insuring agreement. *Id.* at 198–99 (citing *Don's Bldg. Supply, Inc. v. OneBeacon Ins.*, 267 S.W.3d 20, 23 (Tex. 2008)).

Whether an insurance policy requires an insurer to defend its insured presents a question of law, which we review de novo. *Transport Int'l Pool, Inc. v. Cont'l Ins.*, 166 S.W.3d 781, 784 (Tex. App.—Fort Worth 2005, no pet.). An insurer's duty to defend is distinct from, and broader than, its duty to indemnify. *Burlington N. & Santa Fe Ry. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 334 S.W.3d 217, 219 (Tex. 2011); *Zurich Am. Ins. v. Nokia, Inc.*, 268 S.W.3d 487, 490 (Tex. 2008).

To determine an insurer's duty to defend, we apply the eight-corners rule "based on (1) the pleadings against the insured and (2) the terms of the insurance policy." *Monroe*, 640 S.W.3d at 199. We compare the allegations in a plaintiff's pleadings to the policy provisions "without regard to the truth or falsity of those allegations and without reference to facts otherwise known or ultimately proven." *Id.* In most cases—including this case—we may not consider extrinsic evidence or facts outside the pleadings. *Id.*[11]

---

[11]The Texas Supreme Court has recognized two exceptions that allow courts to consider extrinsic evidence on the duty-to-defend question. First, courts may consider

"An insurer must defend its insured if a plaintiff's factual allegations potentially support a covered claim, while the facts actually established in the underlying suit determine whether the insurer must indemnify its insured." *Zurich*, 268 S.W.3d at 490 (citing *GuideOne Elite Ins. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex. 2006)). "We resolve all doubts regarding the duty to defend in favor of the duty, . . . and we construe the pleadings liberally . . . ." *Zurich*, 268 S.W.3d at 491 (first citing *King v. Dall. Fire Ins.*, 85 S.W.3d 185, 187 (Tex. 2002); then citing *Nat'l Union Fire Ins. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997)). But "if there is doubt as to whether the claimant has pleaded a cause of action within coverage, the doubt is resolved in favor of the insured, and the insurer must defend." *Tejas Specialty Grp., Inc. v. United Specialty Ins.*, No. 02-20-00085-CV, 2021 WL 2252742, at *8 (Tex. App.—Fort Worth June 3, 2021, no pet.) (mem. op.) (citing *Nat'l Union*, 939 S.W.2d at 141).

---

extrinsic evidence that the insured and a third party suing the insured colluded to make false representations of fact to secure a defense and create coverage where it would not otherwise exist. *Loya Ins. v. Avalos*, 610 S.W.3d 878, 879 (Tex. 2020). Second, courts may consider extrinsic evidence "if the underlying petition states a claim that could trigger the duty to defend, and the application of the eight-corners rule, due to a gap in the plaintiff's pleading, is not determinative of whether coverage exists." *Monroe*, 640 S.W.3d at 201–02. But such extrinsic evidence must (1) go solely to a coverage issue and not overlap with the merits, (2) not contradict the pleaded facts, and (3) conclusively establish the coverage fact to be proved. *Id.* at 202. Although Zurich, during oral argument, conceptualized the rule and its exceptions as an "eight-corners-plus" rule, neither party has argued that either exception applies.

## B. The Policies and the Pleadings

### 1. The OL&T policies

We turn to the first four corners—that is, the OL&T policies, which covered "premises–operations," and we note two stipulated-to common definitions. First, BNSF was the named insured. Second, the earliest policy defined the "premises," and the latter two policies defined the "insured premises," to be the "[Grace] plant-4 miles east of Libby, Lincoln Co. Montana"—that is, the River Loading Facility—"and include[d] the ways immediately adjoining [such premises] on land."[12]

#### a. The 1965 Policy

The earliest policy contains the following pertinent language:

**[Zurich]**

Agrees with [BNSF], in consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to the limits of liability, exclusion, conditions and other terms of this policy:

**INSURING AGREEMENTS**

**I    Coverage A—Bodily Injury Liability.** To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the hazards hereinafter defined.

. . . .

---

[12]The bracketed phrase "such premises" appeared only in the latter two policies.

16

# DEFINITION OF HAZARDS

**Division 1–Premises–Operations**. The ownership, maintenance or use of the premises, and all operations necessary or incidental thereto.

. . . .

**Division 4–Products–Completed Operations.** (1) Goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, if the accident occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such accident occurs away from premises owned, rented or controlled by the named insured or on premises for which the classification stated in division 1 of Item 4 of the declarations excludes any part of the foregoing; provided, such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold; (2) operations, including any act or omission in connection with operations performed by or on behalf of the named insured on the premises or elsewhere, whether or not goods or products are involved in such operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be "operations" within the meaning of this paragraph: (a) pick up or delivery, except from or onto a railroad car, (b) the maintenance of vehicles owned or used by or in behalf of the insured, (c) the existence of tools, uninstalled equipment and abandoned or unused materials and (d) operations for which the classification stated in division 1 of Item 4 of the declarations specifically includes completed operations.

. . . .

**II  Defense, Settlement, Supplementary Payments**. With respect to such insurance as is afforded by this policy for bodily injury liability . . . , the company shall: (a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account

17

thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient; (b)(1) pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, but without any obligation to apply for or furnish any such bonds; (2) pay all expenses incurred by the company, all costs taxed against the insured in any such suit and all interest accruing after entry of judgment until the company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon; (3) pay expenses incurred by the insured for such immediate medical and surgical relief to others as shall be imperative at the time of the accident; (4) reimburse the insured for all reasonable expenses, other than loss of earnings incurred at the company's request; and the amounts so incurred, except settlements of claims and suits, are payable by the company in addition to the applicable limit of liability of this policy.

. . . .

## EXCLUSIONS

This policy does not apply:

. . . .

(c) under division 1 of the Definition of Hazards . . . to . . . (2) the Products–Completed Operations Hazard, or (3) operations on or from premises, other than as defined, which are owned by, rented to or controlled by the named insured[.]

. . . .

## CONDITIONS

. . . .

**3. Limits of Liability–Coverages A and D.** The limit of bodily injury liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by one person

as the result of any one accident; the limit of such liability stated in the declarations as applicable to "each accident" is, subject to the above provision respecting each person, the total limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by two or more persons as the result of any one accident.

### b.  The 1968 and 1971 Policies

The 1968 and 1971 policies contained language substantially similar to each other and conceptually similar to but different from the language in the 1965 policy.

We quote the following provisions from the latter two policies to aid our analysis:

### I.    COVERAGE A—BODILY INJURY LIABILITY COVERAGE B—PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
Coverage A. bodily injury or
Coverage B. property damage
to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use of the Insured premises and all operations necessary or incidental thereto, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury . . . , even if any of the allegations of the suit are groundless, false or fraudulent, . . . . but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Exclusions

This insurance does not apply:

. . . .

(m) to bodily injury . . . included within the completed operations hazard or the products hazard; [or]

(n) to bodily injury . . . arising out of operations on or from premises (other than the Insured premises) owned by, rented to or controlled by the named Insured . . . [.]

. . . .

## III. LIMITS OF LIABILITY

Regardless of the number of . . . (2) persons or organizations who sustain bodily injury . . . or (3) claims made or suits brought on account of bodily injury . . . , the company's liability is limited as follows:

Coverage A—The limits of bodily injury liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages because of bodily injury sustained by one person as the result of any one occurrence; but subject to the above provision respecting "each person", the total liability of the company for all damages because of bodily injury sustained by two or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to "each occurrence".

. . . .

Coverages A and B—For the purpose of determining the limit of the company's liability, all bodily injury . . . arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

. . . .

## DEFINITIONS

When used in this policy (including endorsements forming a part hereof):

. . . .

**"bodily injury"** means bodily injury, sickness or disease sustained by any person;

. . . .

**"completed operations hazard"** includes **bodily injury** . . . arising out of operations . . . , but only if the **bodily injury** . . . occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the **named insured**. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1) when all operations to be performed by or on behalf of the **named insured** under the contract have been completed,

(2) when all operations to be performed by or on behalf of the **named insured** at the site of operations have been completed, or

(3) when the portion of the work out of which the injury or damages arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The **completed operations hazard** does not include **bodily injury** . . . arising out of

(a) operations in connection with the transportation of property, unless the **bodily injury** . . . arises out of a condition in or on a vehicle created by the loading or unloading thereof . . . ;

. . . .

**"occurrence"** means an accident, including injurious exposure to conditions, which results, during the policy period, in **bodily injury** . . . neither expected nor intended from the standpoint of the **insured**;

. . . .

**"products hazard"** includes **bodily injury** . . . arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury . . .

21

occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others . . . .

## 2. The Libby Lawsuits

We focus next on the other four corners, composed of the 400-plus complaints filed in the Libby Lawsuits. BNSF grouped the complaints by the filing law firm's names into three sets: (1) the Lewis Complaints; (2) the Old McGarvey Complaints; and (3) the New McGarvey Complaints; it gave the trial court a spreadsheet summarizing the complaints' common allegations.[13]

Most of the Lewis Complaints included these pertinent common allegations:

- "Plaintiffs lived, worked, and recreated in proximity to [BNSF's] tracks. As a result of railroad business activities, Plaintiffs were for many years exposed to deadly asbestos[-]contaminated vermiculite[,] which was negligently and recklessly transported, leaked, dropped, and discarded from rail cars used to transport vermiculite . . . ."

- BNSF acted negligently by releasing hazardous asbestos "created by and/or resulting from the railroad defendants' for profit business operations."

- BNSF acted negligently by failing to "properly inspect for unsafe conditions" or to "correct unsafe conditions."

- BNSF acted negligently by having "improper and negligent supervision, which permitted the ultrahazardous and dangerous condition and exposure to persist."

The Lewis Complaints stated that (1) the "vermiculite was transported by rail by [BNSF] from Lincoln County to Great Falls, Cascade County, Montana" and

---

[13]We quote from complaints involving multiple plaintiffs, but we note that the allegations in single-plaintiff complaints are pleaded in the singular.

22

clarified that (2) "[t]he State [of Montana] failed to warn [p]laintiffs and their co-workers of the hazards of asbestos exposure caused by the release of asbestos fibers from the vermiculite mine and mill near Libby, Montana."

The Old McGarvey Complaints were more specific, and all contained the following commonalities:

- "Plaintiffs resided or remained in proximity to the real property of BNSF and were thereby exposed to asbestos dust from BNSF's property and operations."

- "BNSF engaged in abnormally dangerous activities thereby causing the release of asbestos contamination and exposure of Plaintiffs to deadly asbestos. BNSF's business activities in handling, storing, transporting, loading, and using asbestos and asbestos[-]contaminated products were abnormally dangerous . . . ."

- "BNSF was negligent, as follows: (a) in failing to inquire, study and evaluate the dust hazard to human health; (b) in failing to take measures to prevent toxic dust from collecting upon and escaping from its property; (c) in failing to warn Plaintiffs of the true nature of the hazardous effects of the dust; and (d) by acting in concert with []Grace."

- "The Plaintiffs were Grace[], railroad or logger/lumbermill workers, contractors, homeowners or members/residents of the community of Libby, Montana, and/or the children or spouses of said persons, and as such were distinctly exposed to asbestos in unique exposure events and in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances. While many Plaintiffs had repeated or continuous exposures, each of the Plaintiffs' individual exposure is unique in time, location, form, and degree of asbestos contact, and as a result of which Plaintiffs have been diagnosed with asbestos disease."

The New McGarvey Complaints' common allegations were the most detailed:

- "Over the nearly 70 years of vermiculite[-]mining operations, the top several hundred feet of Vermiculite Mountain, located outside of Libby, Montana, was removed. Millions of tons of asbestos[-]contaminated vermiculite ore was excavated, processed and shipped into and out of Libby."

23

- "The ore was mined at Vermiculite Mountain, seven miles northwest of Libby and the asbestos-contaminated vermiculite concentrate was moved via a conveyor belt across the Kootenai River to the River Loading Facility, located 4.5 miles east of BNSF's railyard in Libby (the "Railyard"). BNSF constructed and oversaw the River Loading Facility for the exclusive benefit of [Grace] in furtherance of their common goal of profiting from the sale and distribution of the vermiculite concentrate across the country."

- "The river loading process was extremely dusty. The loaded rail cars and the entire area were constantly coated in a layer of asbestos[-]contaminated vermiculite dust. When hopper cars were loaded at the river site much loose vermiculite accumulated on the top of every car. From the 1950s to 1994, BNSF employees riding in engines pushing the vermiculite cars to town described visible clouds of dust being produced while returning loaded cars from BNSF's River Loading Facility to its downtown Libby Railyard."

- "The EPA has stated that sources of contamination are, at least in part, from properties, railroad tracks, and right-of way owned, leased, and maintained by BNSF, as well as from various railroad operations performed at a number of locations at or near the asbestos mine facility at the Site, and that during the operation of such rail line, vermiculite containing amphibole asbestos was released to the environment through spillage from the rail cars."

- "BNSF played a central role in the vermiculite operations in Libby . . . . BNSF oversaw dust control, safety, construction, and modifications of the Grace shipping facilities. BNSF transported the entirety of the mined payload of Vermiculite Mountain . . . ."

- "Emblematic of Grace and BNSF acting in concert in these operations was the River Loading Facility. The River Loading Facility was constructed and operated throughout its existence on BNSF property . . . . BNSF oversaw all construction of and modifications to the River Loading Facility. This included . . . plans for all River Loading Facility dust control equipment . . . ."

- "BNSF was the property owner of the river loading facility where asbestos-laded vermiculite was loaded onto train cars. BNSF paid for, oversaw, and operated the river loading facility. BNSF maintained a contractual relationship with W.R. Grace, where W.R. Grace employees provided the labor to load the toxic vermiculite concentrate into BNSF train cars. . . . During the loading, transport and storage operations, asbestos[-]contaminated vermiculite was spilled, dumped, and otherwise released onto BNSF property in Lincoln

24

County and thereafter disturbed and distributed by BNSF's consistent and constant industrial activities resulting in the entrainment of asbestos fibers into the air and onto property in Lincoln County."

- "The Plaintiffs were Grace . . . mine or mill workers, independent contractors, loggers, homeowners, gardeners, recreators, ballfield players, lumber mill workers, railroad workers, housewives/children of Grace workers, community members of Libby, Montana, or [sic] otherwise distinctly exposed to asbestos in unique exposure events and in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances. While many Claimants had repeated or continuous exposures, each of the Plaintiff[']s individual exposure is unique in time, location, form, and degree of asbestos contact."

- "The train crews operated the local switching train, known as the 'Libby Logger,' which brought the asbestos-contaminated vermiculite from the so-called 'river loading facility' located on BNSF property some 4.5 miles east of town, adjacent to the base of W.R. Grace's mining operation."

## C. The allegations in the Libby Lawsuits triggered Zurich's duty to defend BNSF.

Zurich did not argue below, and it does not argue on appeal, that the alleged bodily injuries from exposure to asbestos-tainted vermiculite were not "bodily injur[ies]" "caused by accident" or "caused by an occurrence" (under the applicable OL&T policies). Rather, Zurich argued in its scope-of-coverage motion that it had no duty to defend because "none of the pending claims against BNSF involve a plaintiff who claims to have suffered an injury while on the [River Loading Facility] premises or on land immediately adjoining the premises." Appealing from the trial court's rejection of this position, Zurich maintains that it "owes no duty to defend or indemnify Libby Lawsuits where plaintiff does not allege exposure falling within premises operations."

25

But Zurich has not pointed to any individual pleading or group of complaints in which a Libby Lawsuit claimant failed to make such an allegation. Indeed, all three groups of Libby Lawsuits pleaded into the premises–operations coverage—that is, the Libby Lawsuits asserted bodily-injury claims potentially arising out of the ownership, maintenance, or use of the River Loading Facility. *See Zurich*, 268 S.W.3d at 490.

The Lewis Complaints contain the least amount of pleading specificity as to the River Loading Facility. But the common allegations linked the complainants' bodily injuries to BNSF's business activities and operations that caused the release of asbestos-tainted vermiculite from Grace's mine near Libby, Montana. The Lewis Complaints did not need to specifically mention the "River Loading Facility"; rather, their factual allegations needed only have potentially supported a claim under the premises–operations coverage, which they did. *See id.* Applying the eight-corners rule, resolving any doubts about Zurich's duty to defend in favor of the duty (as we must), and construing the Lewis Complaints liberally (again, as we must), we agree that BNSF established Zurich's duty to defend BNSF from and against the plaintiffs in the Lewis Complaints. *See id.* at 491.

The same holds true for the Old and New McGarvey Complaints. The Old McGarvey Complaints tied the claimants' alleged bodily injuries from asbestos exposure to "BNSF's property and operations" around Libby, Montana. This phrasing, although generic, necessarily included the River Loading Facility and BNSF's operations there—which triggered Zurich's duty to defend BNSF from and

against the Old McGarvey Complaints under the premises–operations coverage. *See id.*

And as for the New McGarvey Complaints, we reach the same result because those complaints each specifically mentioned the River Loading Facility and connected the plaintiffs' bodily-injury claims to BNSF's operations at the River Loading Facility. Zurich therefore had a duty to defend BNSF from and against the New McGarvey Complaints as well. *See id.*

In addition to denying that the Libby Lawsuit plaintiffs had pleaded into the OL&T policies' premises–operations coverage (which they had), Zurich alternatively argued against coverage based on the completed–operations exclusion. Zurich asserted that the OL&T policies were limited in scope and sought a declaration that it had no "duty to defend . . . BNSF in connection with any Libby Vermiculite Claims th[at] allege[d] bodily injury for 'completed–operations[,]' including any liability resulting from activity beyond the [River Loading Facility]." Undisputedly, the OL&T policies exclude many things that might eventually operate to limit coverage, but at the duty-to-defend stage, Zurich did not meet its burden to conclusively establish that any of the Libby Lawsuits' complaints fall within the completed–operations exclusion.

An insured bears the initial burden to establish that a claim falls within the scope of a policy's coverage. *Tejas Specialty Grp., Inc.*, 2021 WL 2252742, at *8 (citing *KLN Steel Prods. Co. v. CNA Ins.*, 278 S.W.3d 429, 434 (Tex. App.—San Antonio 2008, pet. denied)). If so, the burden shifts to the insurer to demonstrate that a policy

exclusion applies. *Id.* (citing *Venture Encoding Serv., Inc. v. Atl. Mut. Ins.*, 107 S.W.3d 729, 733 (Tex. App.—Fort Worth 2003, pet. denied) (op. on reh'g)). "The insurer has the burden of proving that the allegations in question establish the policy exclusion to coverage as a matter of law." *Id.* (citing *Gilbert Tex. Constr. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010)).

Once BNSF met its burden of showing that the Libby Lawsuits' allegations fall under the premises–operations coverage, triggering Zurich's duty to defend, Zurich then bore the burden to establish as a matter of law—from within the four corners of the Libby Lawsuits—the completed–operations exclusion to coverage. *See id.* But neither in its scope-of-coverage summary-judgment motion nor in response to BNSF's summary-judgment motion did Zurich demonstrate that any of the Libby Lawsuits' complaints conclusively fall within that exclusion.

In its fourth issue, Zurich raises hypothetical arguments and scenarios—which were derived from summary-judgment evidence beyond the policies and pleadings and a federal pleading that Zurich improperly attached to its appellate brief not before the trial court, *see BNSF Ry. v. Wipff*, 408 S.W.3d 662, 666–67 (Tex. App.—Fort Worth 2013, no pet.)—such as whether all premises–operations were factually completed at the River Loading Facility and whether the completed–operations exclusion would necessarily bar coverage if facts showed that a plaintiff's alleged asbestos exposure arose after BNSF's "loading was complete and away from the [River Loading Facility]." But as BNSF argued below, while the Libby Lawsuits'

28

complaints are silent as to the specific location of each plaintiff's exposure, the "allegations obviously *do* contend bodily injury as a result of operations at the River Loading Facility and *do not* contain any indication that plaintiffs' claimed injuries did not occur on the insured premises or arise out of the operations thereon."

Zurich did not identify any allegations in the Libby Lawsuits' complaints establishing the completed–operations exclusion as a matter of law, and we may not look outside the pleadings or imagine factual scenarios that might trigger or preclude coverage.[14] *See Pine Oak Builders, Inc. v. Great Am. Lloyds Ins.*, 279 S.W.3d 650, 655 & n.25 (Tex. 2009) (citing *Nat'l Union*, 939 S.W.2d at 142). In addition, any doubts about the completed–operations exclusion must be resolved in BNSF's favor. *See Tejas Specialty Grp.*, 2021 WL 2252742, at *11. Because Zurich did not conclusively prove that the Libby Lawsuits contained excluded claims only, barring application of an affirmative defense, Zurich was obligated to defend BNSF from and against the Libby Lawsuits. *See id.* at *10 (stating that conflicting factual inferences do not negate coverage); *see also Amerisure Mut. Ins. v. McMillin Tex. Homes, LLC*, No. SA-20-CV-01332-XR, 2022 WL 686727, at *12 (W.D. Tex. Mar. 8, 2022) (concluding that insurer did not establish the completed–operations exclusion when the underlying allegations did not clearly allege damage occurring after operations were completed). *But cf. Mid-Century Ins. Co. of Tex. v. Childs*, 15 S.W.3d 187, 190 (Tex. App.—Texarkana 2000, no

---

[14]At this stage, we decline to issue an advisory opinion expounding upon the hypothetical applicability of the OL&T policies' completed–operations exclusion.

pet.) ("An insurer is not obligated to defend where the complaint on its face alleges a claim that is excluded from the coverage of the policy.").

Because Zurich did raise exhaustion as an affirmative defense—which BNSF and Zurich both addressed in their respective summary-judgment motions—to resolve Zurich's fourth issue on whether the trial court erred by granting BNSF's motion, denying Zurich's motion, and declaring that Zurich has a duty to defend, we must first analyze Zurich's second issue.

## IV. Counting the Number of Accidents or Occurrences

In its second issue, Zurich argues that the trial court erred (1) by declaring that "each [p]laintiff's alleged exposure in the Libby Lawsuits constitutes a separate accident or occurrence" and (2) by not determining that Zurich had exhausted the policies through prior liability payments up to the yearly per-accident and per-occurrence policy limits and therefore had no ongoing duty to defend. Although we agree that the trial court erred by not concluding that the Libby Lawsuits arose out of a single accident or occurrence under the OL&T policies, we disagree that Zurich conclusively established that its past payments have relieved it of its duty to defend—it presented no such evidence—and conclude that Zurich has a duty to defend BNSF.

### A. The Libby Lawsuits arose out of a single accident or occurrence.

We turn to the first part of Zurich's second issue. In their summary-judgment motions and responses, Zurich and BNSF, respectively, argued for and against

30

whether the Libby Lawsuits arose out of a single accident or occurrence.[15] BNSF prevailed when the trial court determined that the alleged exposure of each Libby Lawsuit claimant—over 1,400 individuals—constituted a separate accident or occurrence. But because the asbestos-exposure claims in the 400-plus Libby Lawsuits are, at their core, alleged to have been caused by BNSF's premises–operations at the River Loading Facility, we conclude that BNSF's complained-of conduct giving rise to the Libby Lawsuit plaintiffs' claims constituted a single causative event.

In analyzing the single- or multiple-occurrence question, our goal is to effectuate the parties' intent as expressed in their insurance contract. *See Monroe*, 640 S.W.3d at 198–99 (citing *Don's Bldg. Supply, Inc.*, 267 S.W.3d at 23). When—as here—an insurance contract uses unambiguous language, we enforce the parties' agreement as written.[16] *See id.* (citing *Don's Bldg. Supply, Inc.*, 267 S.W.3d at 23).

---

[15]Because both parties' summary-judgment motions addressed the single-accident-or-occurrence issue under Texas law, and neither party identified a conflict or asked the trial court to apply any other state's law, we analyze the issue under Texas law, despite Zurich's hedge on appeal urging us to follow Texas law or Montana law if we determine a conflict exists. *See Coca-Cola Co.*, 218 S.W.3d at 685; *see also Burlington N. & Santa Fe Ry. v. Gunderson, Inc.*, 235 S.W.3d 287, 290–91 (Tex. App.—Fort Worth 2007, pet. withdrawn) (holding that trial court properly applied Texas law—presuming other state's law to be identical to Texas's—where party seeking a summary judgment did not file a Rule 202 motion (citing Tex. R. Evid. 202)); *see also Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 473 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (discussing cases holding waiver of choice-of-law complaints).

[16]Both parties agree that the OL&T policies are unambiguous. BNSF stated in its summary-judgment motion, "There is no ambiguity in the Zurich Policies," and Zurich echoed, "[A]s BNSF admits . . . , the [Zurich] OL[&]T policies are unambiguous."

We interpret an insurance policy "according to its own specific provisions and coverages." *Gilbert Tex. Constr., L.P.*, 327 S.W.3d at 129 n.7. "Unless the policy dictates otherwise, we give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015).

As noted, Grace procured premises–operations coverage for BNSF through the OL&T policies. This coverage provided defense and indemnity for bodily injury "caused by accident" (under the 1965 policy) and "caused by an occurrence" (with "occurrence" meaning "an accident" as defined under the two later policies) arising out of the "ownership, maintenance or use of the [River Loading Facility], and all operations necessary or incidental thereto." Although all three policies center on accidental causative events, neither the accident-phrased 1965 policy nor the occurrence-phrased 1968 and 1971 policies separately defined the word "accident."

Accidents are generally understood to be fortuitous, unexpected, and unintended events. *Lamar Homes Inc. v. Mid-Continent Cas.*, 242 S.W.3d 1, 8 (Tex. 2007). Such events must be viewed from the insured's standpoint, which controls whether injury or damage was expected or intended. *Id.* (citing *King*, 85 S.W.3d at 191–92). And unless specifically defined otherwise, an accident or accidental event can be a sudden, one-time event or a situation that is ongoing and continuous over a larger period. *See Travelers Ins. v. Volentine*, 578 S.W.2d 501, 503 (Tex. App.—Texarkana 1979, no writ) (defining accident as "an unexpected, unforeseen[,] or undesigned happening or

consequence from either a known or unknown cause" and citing *Hauenstein v. St. Paul-Mercury Indem. Co.*, 65 N.W.2d 122, 126 (Minn. 1954) (holding that "caused by accident" policy language applied to ongoing use of defective plaster product)).[17]

The 1965 policy does not expressly state that bodily injury caused by accident encompasses both one-time and continuous and ongoing events. But the 1965 policy does not limit coverage to bodily injury caused by *an* accident; it says bodily injury "caused by accident"—denoting a broader meaning that is not limited to sudden, one-time events. *See Travelers Ins.*, 578 S.W.2d at 503; *see also Shipman*, 125 S.E.2d at 75–76; *Hauenstein*, 65 N.W.2d at 126; c*f. Gulf Metals Indus., Inc. v. Chicago Ins.*, 993 S.W.2d 800, 805 (Tex. App.—Austin 1999, pet. denied) (applying a temporal meaning to the phrase "sudden and accidental" to give both words effect).

We similarly interpret the 1968 and 1971 policies. Both policies defined "occurrence" to mean "an accident, including injurious exposure to conditions, which results . . . in bodily injury" and further provided that "all bodily injury . . . arising out of continuous or repeated exposure to substantially the same general conditions shall

---

[17]*See also* Christopher C. French, *Insurance Policies: The Grandparents of Contractual Black Holes*, 67 Duke L.J. Online 40, 48–49 (2017) (explaining that before an industry shift to occurrence-based policies, courts were interpreting accident-based policies to include continuous and ongoing events); Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion*, 75 Cornell L. Rev. 610, 622–25 (1990) (summarizing the early evolution of accident-based policies into occurrence-based polices); *see, e.g., Shipman v. Emp'rs. Mut. Liab. Ins.*, 125 S.E.2d 72, 75–76 (Ga. Ct. App. 1962) (explaining that an "accident" may take place over time).

be considered as arising out of one occurrence." Despite the differing policy language, we conclude that the terms "caused by accident" and "caused by an occurrence" must be interpreted as including not only causative events that are sudden, one-time events but also those that are continuously occurring. *See Travelers Ins.*, 578 S.W.2d at 503; *see also Shipman*, 125 S.E.2d at 75–76; *Hauenstein*, 65 N.W.2d at 126.

We now reach the parties' main dispute: whether the Libby Lawsuits claimants' alleging bodily injury from exposure to asbestos-tainted vermiculite arising out of BNSF's premises–operations at the River Loading Facility alleged one or more causative events. Because the OL&T policies included a $500,000 per-accident or per-occurrence limit of liability—and no policy had an aggregate limit of liability—resolving the counting issue (obviously) impacts Zurich's duty to defend. As the parties stand on opposite edges of a seeming Serbonian Bog,[18] upon which both have raised their respective banners, we resolve the dispute and explain why the Libby Lawsuit claimants have alleged but a single causative event.

Two main tests exist for analyzing the number of accidents and occurrences: (1) the cause test, which looks at the cause or causes of damage and (2) the effects test, which looks to the injuries, damages, or effects resulting from the cause. *See*

---

[18] *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476–77 (Tex. 2012) (citing John Milton, *Paradise Lost* 42, bk. II, ll. 592–94 (Gordon Teskey ed., Norton & Co. 2005) (1674) (describing the land beyond Lethe as "[a] gulf profound as that Serbonian bog/Betwixt Damiata and Mount Casius old/Where armies whole have sunk")).

Michael P. Sullivan, Annotation, *What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount Per Accident or Occurrence*, 64 A.L.R. 4th 668, § 2[a] (1988). Most states, including Texas, apply the cause test. *Id.*; *see, e.g., Foust v. Ranger Ins.*, 975 S.W.2d 329, 333–35 (Tex. App.—San Antonio 1998, pet. denied); *State Farm Lloyds, Inc. v. Williams*, 960 S.W.2d 781, 784–85 (Tex. App.—Dallas 1997, pet. dism'd by agr.) (op. on reh'g); *Goose Creek Consol. ISD v. Cont'l Cas.*, 658 S.W.2d 338, 340–41 (Tex. App.—Houston [1st Dist.] 1983, no writ); *see also Evanston Ins. v. Mid-Continent Cas.*, 909 F.3d 143, 147–48 (5th Cir. 2018) (applying Texas law). Yet even for states that use the cause test, including Texas, courts have disagreed on its application; some look to a single proximate cause, and others consider the existence of liability-triggering events. *See Evanston*, 909 F.3d at 147–48 (discussing *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins.*, 447 F.2d 204 (5th Cir. 1971)); *see also* Michael Murray, Note, *The Law of Describing Accidents: A New Proposal for Determining the Number of Occurrences in Insurance,* 118 Yale L.J. 1484, 1500–04 (2009) (discussing cases applying differing versions of the cause test to asbestos cases that yielded differing outcomes).

Because the Texas Supreme Court has not yet provided guidance on applying the cause test, the parties have cited decisions from other Texas intermediate courts of appeals and from federal and other state courts. In striving for consistent insurance-contract construction, we can appropriately look to those other courts. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 522 (Tex. 1995); *see also*

*H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh (HEB)*, 150 F.3d 526, 531–32 (5th Cir. 1998).

In *Evanston*, the Fifth Circuit observed that "Texas courts agree that the proper focus in interpreting 'occurrence' is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects." 909 F.3d at 147–48 (quoting *HEB*, 150 F.3d at 530). The court further noted that although courts count the number of an insured's acts giving rise to liability, courts sometimes differ on the level of generality by which to define an insured's actions. *Id.* at 148. Notably, the Fifth Circuit questioned whether and when there can be a so-called "overarching cause"—a term that no Texas court has ever used in applying the cause test but one that does get to the heart of whether and how courts should be looking at remote or more immediate causes. *See id.* at 149–50 (clarifying use of so-called overarching-cause analysis and discussing *HEB*, 150 F.3d at 531).

To be sure, the difficulty in applying the cause test from case to case—even those involving similar fact patterns—emanates from policy-language differences and each case's unique factual circumstances. Attempting to synthesize the law addressing this perplexing issue, the Fifth Circuit has interpreted Texas's cause test as follows:

> [T]he appropriate inquiry is whether there was one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages. If so, then there was a single occurrence. If the chain of proximate causation was broken by a pause in the negligent conduct or by some intervening cause, then there were multiple occurrences, even if the insured's negligent conduct which caused each of the injuries was the same kind of negligent conduct.

*Id.* at 150 (analyzing *Foust*, *Goose Creek*, and other cause-test decisions).

This causative rubric is consistent with other jurisdictions' decisions employing the cause test. *See, e.g.*, *Hollis v. Lexington Ins.*, 180 F. Supp. 3d 422, 430 (E.D. Va. 2016) ("Courts focus on the act of the insured that gave rise to their liability to determine if there was one proximate, uninterrupted, and continuing cause which resulted in all the injuries and damage." (cleaned up and collecting cases, including *Appalachian Ins. v. Liberty Mutual Ins.*, 676 F.2d 56, 61 (3d Cir. 1982) (applying Pennsylvania law)), *aff'd*, 682 F. App'x 206 (4th Cir. 2017);[19] *Atchison, Topeka & Santa Fe Ry. v. Stonewall Ins.*, 71 P.3d 1097, 1125 (Kan. 2003) (applying Kansas and Illinois law to noise-induced-hearing-loss claims to uphold single-occurrence determination); *see also Certain Underwriters at Lloyd's, London v. Chicago Bridge & Iron Co.*, 406 S.W.3d 326, 334 (Tex. App.—Beaumont 2013, pet. denied) (applying Illinois's cause test to uphold the trial court's determination that asbestos-exposure claims at a paper mill arose out of a single occurrence). Concluding that "a single continuous occurrence [exists] is especially apt in cases . . . of mass deliveries of hazardous products ultimately imposing damage on large numbers of people." *Uniroyal, Inc. v. Home Ins.*, 707 F. Supp. 1368, 1384–85 (E.D.N.Y. 1988) (involving Agent Orange).

---

[19]Texas courts favorably cite *Appalachian Insurance*'s enunciation of the cause test. *See Foust*, 975 S.W.2d at 334; *Cullen/Frost Bank of Dall., N.A. v. Commonwealth Lloyd's Ins.*, 852 S.W.2d 252, 257–58 (Tex. App.—Dallas 1993), *writ denied*, 889 S.W.2d 266 (Tex. 1994), *abrogated on other grounds by Don's Bldg. Supply, Inc.*, 267 S.W.3d at 24–25.

We apply the cause test in light of the OL&T policies' language and coverage and considering the claims asserted against BNSF in the Libby Lawsuits. *See Evanston*, 909 F.3d at 147–48. Grace procured premises–operations coverage through the OL&T policies for BNSF's benefit. Notably, those policies excluded completed–operations coverage and coverage for BNSF's operations on or from its other property—that is, its nationwide tracks and other property beyond the River Loading Facility. In other words, this coverage was hardly comprehensive; it was limited to the premises–operations at the River Loading Facility.

As we noted, the Libby Lawsuits allege bodily injury arising out of BNSF's operations at the River Loading Facility. The New McGarvey Complaints are the most detailed in pleading into the premises–operations coverage:

> BNSF's active vermiculite operations began in the 1920s and continued until the last shipment of vermiculite left Libby in 1994. The Libby vermiculite was at all times inextricably intermixed with a highly toxic form of asbestos. The 70 years of vermiculite operations resulted in substantial asbestos contamination of BNSF properties and surrounding areas.

But all three complaint iterations tie their exposure to BNSF's continuous operations at the River Loading Facility to plead into the premises–operations coverage. All three sets of complaints allege various forms of wrongdoing, including BNSF's alleged negligence in failing to prevent toxic dust from causing bodily injury, failing to warn about the dangers of the asbestos-tainted vermiculite, and allowing the Libby Lawsuit claimants to be exposed to released asbestos. Through such allegations, the Libby

Lawsuit claimants are causally linking their exposure to BNSF's premises–operations, which we conclude to be the alleged proximate cause of the claimants' alleged bodily injuries.

BNSF asserts that the Libby Lawsuit claimants alleged unique exposure events, pointing to such allegations as these in the New McGarvey Complaints:

> The Plaintiffs were . . . distinctly exposed to asbestos in unique exposure events and in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances. While many Claimants had repeated or continuous exposures, each of the Plaintiff's individual exposure is unique in time, location, form, and degree of asbestos contact.

Such a position arguably advocates for the effects test, which Texas does not follow. *See Foust*, 975 S.W.2d at 333–35; *Goose Creek*, 658 S.W.2d at 340–41; *see also Evanston*, 909 F.3d at 148. Indeed, "[t]he fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence." *See Appalachian Ins.*, 676 F.2d at 61. Because the bodily-injury claims in the Libby Lawsuits "stem from one proximate cause[,] there is a single occurrence." *Id.* (citing *Champion Int'l. Corp. v. Cont'l Cas.*, 546 F.2d 502, 505-506 (2d Cir. 1976)).

Relying heavily on the Fifth Circuit's *Pincoffs* decision, BNSF maintains that it is not arguing under the effects test but is rather arguing under the so-called liability-triggering-event version of the cause test. 447 F.2d at 206–07. In *Pincoffs*, an insured unknowingly imported 110,000 pounds of contaminated bird seed and sold it to eight

feed-and-grain dealers. *Id.* at 205. The eight dealers then sold the contaminated bird seed to numerous bird owners. *Id.* Although the opinion is silent on the manner and method of each bird's exposure, many birds died. *Id.*

When the bird owners sued the dealers, the dealers made claims against Pincoffs, which sought defense under two liability policies. *Id.* The primary policy had a $50,000 per-occurrence limit and a $100,000 aggregate limit, and the parties disputed whether there had been one occurrence or more. *Id.* at 205–06.

Interpreting "occurrence" as defined in the policy, the Fifth Circuit held that the originating act of contamination—over which Pincoffs had no control—did not subject Pincoffs to liability. *Id.* at 206; *see also* 3 Allan D. Windt, Insurance Claims & Disputes § 11:25 (6th ed. 2024) ("In order to determine the number of occurrences, it is logical to focus upon the act over which the insured exercised control."). Rather, Pincoffs' sales to the eight dealers created the exposure for any resulting damages— without regard to how many birds died. *Pincoffs*, 447 F.2d at 206. The court thus determined that there were eight separate occurrences within the meaning of the policy at issue. *Id.* at 207.

Although BNSF argues that *Pincoffs* supports its multiple-occurrence position, *Pincoffs*—as informed by *Evanston*—supports Zurich's one-occurrence position. In *Evanston*, the Fifth Circuit applied Texas's cause test in the context of a runaway Mack truck and concluded that the driver's uninterrupted, ongoing negligence caused a multi-vehicle accident. 909 F.3d at 151. Because there was no indication that the

40

driver regained control of his truck or that his negligence was otherwise interrupted between collisions, the court concluded that all the collisions resulted from the same continuous condition, which constituted a single "accident." *Id.* Here, like in *Evanston*, where the parties agreed that the insured "did not apply the brakes at any time . . . until all the vehicles came to rest," *id.*, BNSF has presented the pleadings from the Libby Lawsuits, which allege that BNSF, without pause, continuously operated in a manner at the River Loading Facility that caused the Libby Lawsuit claimants to become exposed to asbestos-tainted vermiculite. As Zurich frames the issue, BNSF never "applied its brakes" to its River Loading Facility operations.

The Fifth Circuit's cause-test analysis in *Evanston* is much more thorough, current, and reliant on Texas law than *Pincoffs*,[20] but *Pincoffs* also fits within *Evanston*'s causative framework and can be applied to the Libby Lawsuits. Like *Pincoffs*' numerous bird owners, for the numerous Libby Lawsuit claimants—all of whom experienced differing and unique exposures to and resulting damages from a contaminated product—courts can identify the proximate causative event over which each involved insured exercised control. For the bird owners' property-damage claims, it was each point of sale of the contaminated birdseed by Pincoffs (that is, to the eight dealers). 447 F.2d at 207. For the Libby Lawsuit plaintiffs' bodily-injury claims, the sole

---

[20]The one Texas case *Pincoffs* cites is a "venue case" that does not mention the cause test or involve an insurance-coverage dispute. 447 F.2d at 206 (citing *O.M. Franklin Serum Co. v. C.A. Hoover & Son*, 410 S.W.2d 272, 273–74 (Tex. App.—Amarillo 1966), *writ ref'd n.r.e.*, 418 S.W.2d 482 (Tex. 1967)).

proximate cause of their exposure claims against BNSF was BNSF's operations at the River Loading Facility where BNSF continuously conducted its loading and transporting of asbestos-contaminated vermiculite—the hazard insured against in the OL&T policies.[21]

Accordingly, we hold that the trial court erred by granting BNSF's summary-judgment motion and by denying Zurich's cross-motion on the number of causative events and by declaring that each Libby Lawsuit plaintiff had alleged a separate accident or occurrence.

## B. Zurich presented no evidence that its duty to defend was terminated by its 2012 settlement contribution.

We now turn to the second half of Zurich's second issue: whether the trial court erred by granting BNSF's summary-judgment motion and denying Zurich's

---

[21]BNSF also argues its multiple-occurrence position under *Goose Creek*, but that case is distinguishable. *Goose Creek* involved an arsonist who set two fires on two unconnected school-district properties. Looking to *Pincoffs* and a federal decision applying Oklahoma's cause test, *Transport Insurance Co. v. Lee Way Motor Freight*, 487 F. Supp. 1325, 1330–31 (N.D. Tex. 1980), the court of appeals in *Goose Creek* stated that the two fires "were not part of a process of continuum[] but were set at different places and at different times." 658 S.W.2d at 340. Notably, nothing indicates that the insurer argued that some singular act of the school district somehow caused or contributed to the fires (likely because the coverage at issue was not liability coverage). *Id.* (explaining that in *Lee Way*, the hazard insured against was the insured's discrimination, so the insured's uniform, system-wide discriminatory policy constituted a single occurrence). For the same reasons, we are similarly not persuaded by BNSF's reliance on *State Farm Lloyds, Inc. v. Williams*. 960 S.W.2d at 784– 85 (concluding under a homeowner's policy that a homeowner's shooting two people in the same room constituted separate "occurrences" because the injuries resulted from two separate acts, each independently giving rise to liability).

cross-motion concerning whether Zurich's prior 2012 settlement contribution exhausted the $500,000 per-accident and per-occurrence limits of liability. As we explain, the trial court did not so err.

An insurance policy's limit-of-liability provision "sets a maximum benefit payable under the specific type of coverage provided for in the insuring agreement." *See Farmers Tex. Cnty. Mut. Ins. v. Zuniga*, 548 S.W.3d 646, 653 (Tex. App.—San Antonio 2017, no pet.) (first citing *Jankowiak v. Allstate Prop. & Cas. Ins.*, 201 S.W.3d 200, 206 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (recognizing that the limit-of-liability language provided "a maximum limit of recovery for each specific coverage"); then citing *Am. States Ins. Co. of Tex. v. Arnold*, 930 S.W.2d 196, 200 (Tex. App.—Dallas 1996, writ denied) (explaining that the limit of liability applied to the coverage defined in the insuring agreement)); *see also St. Paul Ins. v. Texas Dep't of Transp.*, No. 03-01-00192-CV, 2001 WL 1627658, at *2 (Tex. App.—Austin Dec. 20, 2001, no pet.) (not designated for publication) (stating that exhaustion is not an affirmative defense or policy exception to the duty to defend but instead is a condition on the duty to defend, limiting the duty to the time before the policy limits are exhausted). Consequently, "settlements that result in the exhaustion of policy limits excuse further performance by the insurer." *See Carter v. State Farm Mut. Auto. Ins.*, 33 S.W.3d 369, 373 (Tex. App.—Fort Worth 2000, no pet.) (citing *Arnold*, 930 S.W.2d at 201); *Childs*, 15 S.W.3d at 190 (concluding that an insurer was not

43

required to provide a defense because it had already paid the total available funds for the type of claim involved).

On appeal, BNSF "recognizes that the [1968 and 1971] policies specifically provide that defense obligations terminate with policy limits." But it contends that the 1965 policy contains no such termination right, despite the stated $500,000 per-accident liability limit. BNSF points to the 1965 policy's "Defense, Settlement, Supplementary Payments" provision quoted above to argue that the following language requires Zurich to defend under the 1965 policy no matter how much it pays under the liability coverage: "With respect to such insurance as is afforded by this policy for bodily injury liability . . . , the company shall: (a) defend any suit . . . and the amounts so incurred, except settlements of claims and suits, are payable by the company *in addition to the applicable limit of liability of this policy*." [Emphasis added.]

BNSF's interpretation of the "in addition" language means that even if Zurich had exhausted its limit of liability, Zurich would still have an ongoing and seemingly perpetual duty to defend BNSF under the 1965 policy. This misinterprets the "in addition" language and ignores the policy's stated per-accident liability limit. The purpose of the "in addition" language was not to give BNSF a perpetual right to defense without regard to whether Zurich had paid its per-accident policy limit. *See* Barry L. Kroll & John M. Edwards, *Insurance Law*, 19 Loy. U. Chi. L.J. 525, 526–31 (1988) (discussing the "in addition" language at issue in *Zurich Insurance v. Raymark Industries, Inc.*, 514 N.E.2d 150 (Ill. 1987)); *see also Arnold*, 930 S.W.2d at 201 n.1 ("Our

44

decision today comports with the decisions of other courts construing the same or similar policy language."). Rather, the language made clear that for so long as Zurich had a duty to defend, its obligation to pay for the cost of that defense was in addition to its liability payments. Stated another way, Zurich could not use its cost of defense to erode what it potentially owed for liability; it owed for defense costs "in addition" to what it owed for liability. *See generally Blevins v. State Farm Mut. Auto. Ins.*, No. 02-17-00276-CV, 2018 WL 5993445, at *45 n.25 (Tex. App.—Fort Worth Nov. 15, 2018, no pet.) (mem. op.) (Birdwell, J., dissenting on denial of en banc reconsideration) ("A 'wasting policy' is one that deducts from policy limits the litigation fees and expenses incurred, ordinarily by the insurer in defending the insured against a claim." citing *Westchester Fire Ins. v. Admiral Ins.*, 152 S.W.3d 172, 192 & n.10 (Tex. App.—Fort Worth 2004, pet. denied) (en banc op. on reh'g)).

We therefore interpret all three OL&T policies as placing an outer limit of liability that could potentially end Zurich's duty to defend BNSF, and we turn to the parties' cross-motions on exhaustion. To avoid BNSF's motion for summary judgment on the duty to defend, Zurich needed to present evidence sufficient to raise a fact issue on its exhaustion defense, *see Am. Petrofina*, 887 S.W.2d at 830, and to prevail on its own summary-judgment motion, Zurich needed to conclusively prove exhaustion, *see Chau*, 254 S.W.3d at 455. As we explain, Zurich did not meet either burden.

In Zurich's summary-judgment motion on exhaustion, and in response to BNSF's motion raising exhaustion, citing *Arnold*, *Carter*, and *Childs*, Zurich argued that its $5.4 million contribution toward the overall $18 million funding of the 2012 settlement exhausted the OL&T policies' limits and terminated Zurich's duty to defend BNSF. As evidence, Zurich cited the confidential 2012 settlement agreement and its after-the-fact statements about that agreement. But Zurich's fundamental problem is that the 2012 settlement agreement that included BNSF and the Libby vermiculite claimants did not itself state what Zurich's contribution was going to be, and it did not limit or otherwise attribute Zurich's settlement payment solely to BNSF's premises–operations liability.

Among the insurers involved in the 2012 settlement, in their separate allocation agreement, each agreed to pay a percentage of the $18 million, and Zurich—without any stated explanation of allocation—agreed to pay 30% of the $18 million. Although Zurich explains that its $5.4 million contribution is composed of $4.5 million for liability payments under the OL&T policies ($500,000 for each of the nine years) and $900,000 in defense costs, nowhere in the settlement documents is that allocation stated. Rather than evidencing such an allocation, the settlement agreement states that the settlement encompassed not only BNSF's alleged contractual liabilities to Libby vermiculite claimants under the OL&T policies but also potential extra-contractual liabilities (as defined under the agreement among BNSF, the insurers, and the Libby vermiculite claimants).

Additionally, as BNSF has argued, the 2012 settlement agreement did not expressly state that Zurich was exhausting the OL&T policies, and the settlement language undercuts Zurich's position on exhaustion. For instance, BNSF and Zurich specifically

> agree[d], as an essential and integral part of this Agreement, that this Agreement and the matters contained in this Agreement are not intended to be, and shall not be, admissible or relevant in any case or proceeding to prove the acceptance by any Party hereto of any particular theory of coverage.

They also agreed that, with limited exception, nothing in the agreement "shall be construed (1) as an admission of liability by BNSF . . . or [Zurich] . . . to one another or (2) as a concession by BNSF . . . [or Zurich] . . . that any particular theory with respect to liability or coverage is valid."

Zurich and BNSF mutually agreed that their "entire agreement and understanding" about the 2012 settlement agreement was solely expressed and contained in that written agreement—and that agreement did not attribute or connect Zurich's eventual $5.4 million funding contribution to the exhaustion of the OL&T policies' per-accident or per-occurrence limits. Instead, Zurich expressly agreed that the settlement agreement was "intended to be and [was] a commercial accommodation among the Parties and shall not be construed as an admission of coverage under the . . . policies issues by . . . [Zurich], or an admission of liability to the BNSF Claimants or to anyone else."

47

Zurich therefore failed to offer any evidence that it has exhausted the OL&T policies' limits of liability through the funding of the 2012 settlement agreement. Accordingly, the trial court did not err by denying Zurich's motion for summary judgment concerning exhaustion and by granting BNSF's motion on the duty to defend.

We sustain Zurich's second issue concerning the single-accident-or-occurrence summary-judgment ground, and we reverse the trial court's granting of BNSF's motion and denying Zurich's motion on this ground.[22] Although we hold that all three OL&T policies contain a maximum per-accident or per-occurrence limit on Zurich's liability that could be shown to terminate Zurich's duty to defend, because Zurich failed to present evidence sufficient to raise a fact issue on exhaustion, the trial court did not err by granting BNSF's motion on the duty to defend and by declaring that "Zurich has a duty to defend BNSF from and against [the Libby Lawsuits]." We otherwise overrule Zurich's second and fourth issues.

## V. Recoupment

In its fifth issue, Zurich argues that the trial court erred by denying its summary-judgment motion seeking a declaration that Zurich is entitled to recoup any

_____

[22]Having sustained the part of Zurich's second issue that the Libby Lawsuits arose out of a single accident or occurrence, we need not reach Zurich's third issue, in which Zurich maintains that the trial court should have granted summary judgment on various affirmative defenses that would have precluded BNSF from arguing against the single-accident-or-occurrence position because of its position in earlier litigation. *See* Tex. R. App. P. 47.1.

defense costs paid to BNSF after Zurich's duty to defend ended following Zurich's $5.4 million settlement contribution in 2012. Zurich's argument suffers two key flaws.

First, for the reasons stated in the section above, Zurich has a duty to defend BNSF from and against the Libby Lawsuits, which Zurich failed to show was terminated by exhaustion. Accordingly, on that basis, we can affirm the trial court's denial of Zurich's motion seeking post-exhaustion recoupment.

Second, Zurich failed to meet its evidentiary burden on its alleged right to recoupment. The parties disputed below whether Texas or Montana law applied to Zurich's recoupment claim. Montana appears to be among the states that allow an insurer, with proper notice, to unilaterally declare a right to recoupment without requiring the insured's consent. *See Travelers Cas. & Sur. Co. v. Ribi Immunochem Rsch., Inc.*, 108 P.3d 469, 480 (Mont. 2005).[23] In contrast, Texas requires an insured's consent, typically contained in a policy provision—a position that aligns with the Restatement of the Law on Liability Insurance. *See Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 45–46 (Tex. 2008) ("[A] unilateral reservation-of-rights letter cannot create rights not contained in the

---

[23]We observe that at least two justices on the Montana Supreme Court have more recently questioned *Ribi*'s holding's breadth because, among other reasons, the parties in *Ribi* had reached an agreement about recoupment, which the Montana Supreme Court acknowledged but did not factor into its analysis. *Nat'l Indem. Co. v. State*, 499 P.3d 516, 548–51 (Mont. 2021) (Davies, J., concurring) ("I write separately to concur to emphasize that the parties did not raise—and this Court has not addressed—whether an insurer has the right to recoupment against the average insured in the absence of a policy provision allowing recoupment.").

insurance policy[.]" (quoting *Tex. Ass'n of Cntys. Cnty. Gov't Risk Mgmt. Pool v. Matagorda Cnty.*, 52 S.W.3d 128, 131 (Tex. 2000))); *see also* Cyrus W. Haralson & Christina A. Culver, *Texas Law and the Restatement of the Law of Liability Insurance: An Initial Comparison of Blackletter Principles*, 17 J. Tex. Ins. L. 3, 7 (Spring 2019) (discussing Texas law and the Restatement of the Law of Liability Insurance § 21 (2019)).

But Zurich failed to meet its evidentiary burden under either state's law. Zurich did not proffer any summary-judgment evidence (1) that the OL&T policies expressly allowed for Zurich's recoupment claim—they did not—or (2) that BNSF had otherwise consented to or was notified of such a claim. Rather, Zurich pointed to a single document: a reservation-of-rights letter concerning only the 1971 Zurich policy and a Libby vermiculite claimant (in a separate federal case filed in 2013) whose name is not listed among the claimants in the 400-plus Libby Lawsuits.

In the reservation-of-rights letter, which Zurich quoted in its summary-judgment motion and cited in its brief, Zurich stated that it was providing a defense, subject to reserving its rights, and unilaterally declared its right to seek recoupment from BNSF:

> In the event that [Zurich] pays any amounts *in connection with this lawsuit*, and newly-discovered information shows that any of *the plaintiff's claims asserted in this lawsuit* are not covered under any [Zurich] policy, Zurich expressly reserves its right to seek recoupment from BNSF of any amounts paid by [Zurich] in connection *with those claims*." [Emphases added.]

50

This letter pertained only to a single, unrelated lawsuit involving a claimant who was not within the Libby Lawsuits before the trial court. Therefore, despite Zurich's sweeping assertion that it reserved its right to recoupment for defending the Libby Lawsuits, Zurich offered no summary-judgment proof that it actually notified BNSF that it was unilaterally reserving the right of recoupment specifically in connection with the Libby Lawsuits. Because Zurich failed to carry its evidentiary burden on its recoupment claim under both Texas and Montana law, the trial court did not err by denying its summary-judgment request for recoupment, and we overrule Zurich's fifth issue.[24]

## VI. Conclusion

Having sustained in part and overruled in part Zurich's second issue, and having overruled Zurich's fourth and fifth issues, without reaching its third issue, we

---

[24]Faced with BNSF's argument that Texas law does not allow Zurich the right to recoupment, Zurich asks us to declare that it has such a right under Montana law. But because Zurich did not file a Rule 202 motion to squarely present that argument with supporting evidence to the trial court, *see Coca-Cola Co.*, 218 S.W.3d at 685; *Gunderson, Inc.*, 235 S.W.3d at 290–91, and because Zurich did not meet its summary-judgment burden to conclusively establish its recoupment right under either state's law, in affirming the trial court's denial of Zurich's summary-judgment ground seeking recoupment we need not further decide the applicability or scope of either state's recoupment law. *See Infinity Cnty. Mut. Ins. v. Tatsch*, 617 S.W.3d 614, 621 (Tex. App.—San Antonio 2020, pet. denied) ("[T]he filing of traditional cross-motions for summary judgment does not permit a court to engage in factfinding or to supply missing material facts by presumption or surmise."); *see also* Tex. R. App. P. 47.1.

affirm in part and reverse in part the trial court's final judgment.[25] We reverse that portion of the trial court's final judgment granting BNSF's summary-judgment motion in its entirety and denying Zurich's exhaustion motion for summary judgment in its entirety and render judgment granting Zurich's motion and denying BNSF's solely on the issue of counting occurrences.

Concerning the trial court's declaration that "[e]ach Plaintiff's alleged exposure in the Libby Lawsuits constitutes a separate accident or occurrence," we render judgment declaring that BNSF's complained-of conduct giving rise to the plaintiffs' claims against BNSF in the Libby Lawsuits constituted a single accident or occurrence. We affirm the remainder of the trial court's final judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: March 13, 2025

---

[25]In its first issue, Zurich generally argues that the trial court erred by granting BNSF's summary-judgment motion and by denying Zurich's cross-motions. Based on our disposition of Zurich's other four issues, we need not separately analyze Zurich's first issue, and we sustain in part and overrule in part Zurich's first issue for the reasons we state as to each of Zurich's other issues.